[No. S022789. Dec. 3, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN NIETO BENITEZ, Defendant and Appellant.

92

COUNSEL

Stephen Gilbert, under appointment by the Surpeme Court, for Defendant and Appellant.

Fern M. Laethem, State Public Defender, Philip M. Brooks, Deputy State Public Defender, Ronald Y. Butler, Public Defender (Orange), Carl C. Holmes, Chief Deputy Public Defender, Deborah Ann Kwast, Assistant Public Defender, Thomas Havlena and Denise M. Gragg, Deputy Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Harley D. Mayfield and Gary W. Schons, Assistant Attorneys General, Robert M. Foster, Rudolf Corona, Jr., Raquel M. Gonzalez and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, J.**—This case presents the question whether the act of brandishing a firearm may constitute an act sufficiently dangerous to life to support a conviction of second degree murder on an implied malice theory. (Pen. Code, §§ 187, subd. (a), 189.)[1] The Court of Appeal held that although the act of intentionally *firing* a handgun could support a finding of malice, the act of intentionally *brandishing* a handgun, as a matter of law, could not support such a finding. Because the trial court's instructions permitted the jury to base a finding of malice on defendant's intentional brandishing of a firearm, the Court of Appeal concluded that defendant's conviction of second degree murder must be reversed.

We conclude the Court of Appeal erred in reversing defendant's conviction. Although a jury may determine, under the circumstances of a particular case, that a defendant's brandishing of a firearm did not pose a sufficient danger to human life to establish that the defendant acted with malice, in other circumstances the act of brandishing a firearm may be sufficiently dangerous to human life to support a finding of malice. The Court of Appeal erroneously concluded that the trial court in this case instructed the jury that defendant's brandishing of a firearm was sufficient to constitute malice; however, in fact, the trial court did not improperly remove this issue from the consideration of the jury. Instead, the trial court's instructions left it to the jury to determine whether, under all the circumstances of the case, the

---

[1]All further statutory references are to the Penal Code.

natural consequences of defendant's brandishing of the firearm were danger-ous to human life, and whether defendant brandished the firearm with knowledge of the danger to, and with conscious disregard for, human life. In our view, the trial court did not err in so instructing the jury, and the Court of Appeal erred in reversing the judgment on this ground.

I. FACTS

On July 8, 1989, in the early evening, defendant was at the intersection of Jeffrey Drive and Lynne Avenue in Anaheim, eating his dinner near a catering truck. Defendant was seated on a milk crate, while directly behind him, the victim, known as Guero,[2] and another man, identified only as Caballo, were engaged in horseplay. Guero reached around Caballo and attempted to tip over Caballo's plate. In response, Caballo spun around and threw the entire plate of food at Guero. When Guero ducked, the plate of food struck defendant on the back of his head, the food falling down defendant's back and staining his shirt.

Defendant threw away his plate and took off his shirt. Holding the shirt in his hand, he walked over to where Guero and Caballo stood, and asked, "Who is going to wash my shirt?"

Guero and Caballo feigned ignorance, and Guero then replied, "We're not going to wash your shirt." Defendant insisted that one of them wash his shirt. Guero, who was holding a broomstick, responded, "[N]o way, it was an accident."

An argument ensued. Guero said, "What are you going to do about it? You going to bring a gun or knife or what?" He added, "It was an accident, anyway, so why don't you go ahead and leave?"

Defendant replied, "It's going to be an accident if a bullet goes off and hits one of you, too."

Guero, becoming angry, responded, "Okay, go ahead and bring it. Bring what you want, a knife or a gun." Guero, holding the broomstick, turned and walked away.

---

[2]No witness knew Guero by any other name. To avoid confusion, we shall refer to him by that name. His true name was Lorenzo Lopez Mena.

Defendant, who lived nearby, went home and told his roommate, Carlos Arreola,[3] that some persons had been playing around near the catering truck, and that one of them had thrown food on his shirt. Defendant's shirt was stained, and he was angry. He told Arreola that he was going to go back and make those "cabrones"[4] wash his shirt. Defendant went to his room, obtained a clean shirt, and then left his apartment, repeating that he was going to make those "cabrones" wash his shirt. The evidence suggested that defendant concealed on his person a handgun and extra ammunition before leaving the apartment.

Defendant returned to the catering truck a few minutes later. Appearing frightened and angry, he walked to within three feet of Guero. Broomstick in hand, Guero stepped closer to defendant. When Guero asked defendant what he wanted, defendant inquired who was going to wash his shirt. Guero replied that no one was. In response, defendant said, "Well, then one of you two is going to leave."

After defendant and Guero argued for two or three minutes, Guero said either "Let's get it on," or "Take out your knife or whatever you have." Guero, dropping the broomstick, lunged toward defendant as if to grab or punch him.

Guero never reached defendant. As Guero lunged forward, defendant drew a firearm from his waistband, his finger on the trigger. The evidence was in conflict as to whether defendant pointed the gun horizontally (toward Guero) or vertically (toward the sky). One witness, Hector Reynoso, testified that defendant pointed the weapon toward Guero. Similarly, another witness, 12-year-old Israel Alvarado, testified that defendant "shot at" Guero. On cross-examination, however, Alvarado testified that defendant "didn't have time to point" the firearm at Guero. On redirect examination, Alvarado denied having seen defendant point it upwards, and denied having so informed the defense investigator, Alfredo Rasch. (Rasch subsequently testified during the defense that, prior to trial, Alvarado told him defendant had pointed the weapon upwards.)

---

[3] The full name of defendant's roommate was Carlos Arreola Velasques. To avoid confusion, we shall refer to him as Carlos Arreola, the name by which he was described at trial.

[4] Most of the testimony at trial was in Spanish and was translated by an interpreter. The reporter's transcript indicates the interpreter at trial translated "cabrones" to mean "son[s] of bitches." Defense counsel asked Carlos Arreola whether he could define "cabrones" in English; shortly thereafter, the prosecutor objected, and a hearing was conducted outside the jury's presence. Defense counsel argued that the word actually has several meanings, and that this circumstance frustrated his cross-examination of Arreola. According to defense counsel, "cabron" (the singular form of "cabrones") can be defined as any one of a variety of derogatory or innocuous epithets, depending on the context in which the word is used. The precise translation of the word was marginally relevant at trial, because the prosecution sought to establish that defendant's usage of the word indicated a sufficient degree of anger on his part to have led him to form a willful, deliberate, and premeditated plan to kill Guero.

The weapon fired as it was drawn. Guero slumped to the ground, having suffered a mortal bullet wound to the neck. Defendant ran to his apartment, chased by a bottle-throwing crowd of Guero's friends. At his apartment, defendant told his roommate, Carlos Arreola, "I think I killed the 'cabron,' a 'marijuano.' "[5] Defendant paced about the apartment, the weapon in his hand and a box of ammunition in his pocket. He was nervous and sorry, repeatedly asking, "Oh my God, what have I done?" At one point, he attempted to jump from the second-story window of his apartment, but Arreola intervened.

Defendant asked Carlos Arreola for a ride to the bus station, but Arreola indicated that flight only would worsen the situation. Arreola suggested that defendant give himself up. In response to a call from an unidentified person, police officers were dispatched to the scene of the shooting, and then arrived at defendant's apartment, where defendant surrendered without incident.

During their search of the apartment, officers seized a .38-caliber five-shot revolver as well as ammunition found inside a detergent box located in the bathroom. The revolver contained four live rounds and one spent casing. Although the weapon's trigger guard was missing, an expert witness called by the prosecution provided unrefuted testimony at trial that this defect did not affect the operation of the gun. According to the prosecution's expert, the revolver was in good working condition and had a normal "trigger pull."

Guero died at the hospital approximately one hour after the shooting. The cause of death was blood loss from a single gunshot wound to the neck. The path of the bullet was slightly upward (about 10 degrees), perforating the jugular vein. There was stippling around the entrance wound, indicating the bullet was fired from a short distance, probably six inches or less.

Defendant did not testify at trial. Rather, he sought to demonstrate through the testimony of others that he had not pointed the firearm toward Guero, and therefore could not have intended to kill him. Defense witnesses also testified that defendant's actions were taken in response to Guero's aggressive and combative behavior, and that Guero had a reputation in the neighborhood as a short-tempered fighter.

---

[5]"Marijuano" was defined at trial by Arreola as a derogatory term signifying someone "who is out in the streets," or a drug addict. Guero had traces of cocaine in his system, as well as a blood-alcohol level of .09 percent measured after Guero had received transfusions at the hospital.

## II. PROCEDURAL HISTORY

### A. *The trial court's instructions to the jury*

Following the parties' presentation of evidence, the prosecutor, in making his closing argument, asked the jury to return a verdict of first degree murder. Defense counsel, in closing, argued that defendant was, at most, guilty of manslaughter. The trial court instructed the jury consistent with the parties' respective theories.[6] Additionally, and of particular relevance to the present discussion, is the trial court's instruction of the jury pursuant to CALJIC No. 8.31, which provides: "Murder of the second degree is [also] the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

During its deliberations, the jury asked the court to explain the term, "intentional act," as used in CALJIC No. 8.31.[7] The prosecutor requested that the court answer the jury's question by referring specifically to the "pulling of a handgun in the manner described" as one example of an "intentional act" as that term is used in CALJIC No. 8.31. Defense counsel objected to the prosecutor's request, contending that "the pulling of the handgun . . . is an act precedent to death resulting, but it is not itself the intentional act that is referred to in [CALJIC No.] 8.31."

The trial court rejected defense counsel's argument, adopting instead the prosecutor's proposed answer to the jury's inquiry. The court thus informed the jury: "The word 'intentional' as it is used in CALJIC [No.] 8.31 has no

---

[6] The court's instructions to the jury included those relating to excusable homicide (California Jury Instructions, Criminal (5th ed. 1988) [hereafter, CALJIC] No. 5.00), resisting attempt to commit felony (CALJIC No. 5.10), justifiable homicide based on self-defense (CALJIC Nos. 5.12 and 5.13), manslaughter based on honest but unreasonable belief in necessity to defend (CALJIC No. 5.17), self-defense against assault (CALJIC No. 5.30), deliberate and premeditated first degree murder (CALJIC No. 8.20), murder of the second degree (CALJIC No. 8.30), second degree murder—killing resulting from unlawful act dangerous to life (CALJIC No. 8.31), voluntary manslaughter (CALJIC No. 8.40), heat of passion (CALJIC No. 8.42), involuntary manslaughter (CALJIC No. 8.45 [mod.]), exhibiting firearm/deadly weapon (CALJIC No. 16.290), and dueling (special instructions). All further CALJIC references are to the fifth edition, unless otherwise indicated.

[7] The foreperson of the jury submitted the following inquiry to the trial court: "We, the jury in the above entitled action, request the following: [¶] Explanation (definition or extent of applicability) of 'intentional act' as used in the definition of condition No. 1, second degree murder—killing resulting from unlawful act dangerous to life (CALJIC [No.] 8.31)."

special or unique legal meaning and should be construed as it would be in everyday language. The word 'act' as it is used in CALJIC [No.] 8.31 refers to an act from which death in fact results. In the instant case the pulling of a handgun in the manner described and/or the shooting of the handgun in the manner described are possible acts for your consideration. There may be others. Whether any such act occurred and whether any such act otherwise meets the requirements of CALJIC [No.] 8.31 is a matter solely for your determination based on the evidence. [¶] Please do not construe this proposed explanation of an intentional act to be a comment by the Court on the evidence or a suggestion by the Court on what you should find to be the facts. Please remember that you are the exclusive judges of the facts and you may disregard any or all of my comments if they do not coincide with your views of the evidence." (The final two sentences were added by the court to the response suggested by the prosecutor.)

Twenty-five minutes after receiving the court's response to its question, the jury returned its verdict finding defendant guilty of second degree murder. The verdict form signed by the foreperson stated: "We the Jury find the Defendant, MARTIN NIETO BENITEZ, GUILTY of the crime of felony, to wit: Violation of Section 187 of the Penal Code of the State of California (Murder), in the Second Degree. . . ." The jury annotated the verdict form, immediately following the word, "Degree," to include the words, "WITH IMPLIED (NOT EXPRESS) MALICE." The jury also found true the allegation that defendant had used a firearm in committing the murder. Thereafter, the court denied defendant's motion for new trial pursuant to section 1181, subdivision (5), as well as defendant's motion to modify the verdict to the lesser included offense of involuntary manslaughter, pursuant to section 1181, subdivision (6). The court sentenced defendant to serve a term of 15 years to life in state prison, plus an additional 2 years based on the firearm-use enhancement (§ 12022.5), for a total sentence of 17 years to life.

### B. *Court of Appeal decision*

Defendant appealed from the judgment, contending the trial court committed instructional error in informing the jury that a finding of implied malice could be based solely on the intentional act of drawing a firearm. Defendant argued the trial court had ignored the requirement that the act underlying the finding of implied malice be the proximate cause of death. According to defendant, the correct response to the jury's inquiry would have stated that brandishing a firearm in the presence of another person constitutes a misdemeanor, but that a death resulting from such an act is manslaughter, not murder. According to defendant, deliberately *firing* a handgun could constitute a predicate act supporting a finding of implied malice, but "*pulling*" the handgun could not.

A majority in the Court of Appeal agreed with defendant, holding that defendant's conviction should be reversed. The dissenting justice concluded that defendant's act of brandishing the firearm, when viewed in the context of defendant's overall course of conduct, was sufficient to support a finding of implied malice, and that defendant's conviction should be affirmed.

The People petitioned for review, contending that the Court of Appeal erred in finding instructional error, and asserting that the jury's specific finding of implied malice properly could be based on defendant's retrieval of a lethal weapon, his immediate return to the scene of a heated argument, and his pointing of the loaded revolver at his adversary—*even if* the weapon discharged accidentally, and even though the underlying offense committed by defendant (brandishing a firearm) is classified as a misdemeanor.[8] We granted review to address this contention.

III. DISCUSSION

A. *Second degree murder with implied malice*

Second degree murder is defined as the unlawful killing of a human being *with malice aforethought*, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; *People v. Jeter* (1964) 60 Cal.2d 671, 675 [36 Cal.Rptr. 323, 388 P.2d 355]; *People v. Brust* (1957) 47 Cal.2d 776, 783 [306 P.2d 480]; *People v. Thomas* (1945) 25 Cal.2d 880, 903-904 [156 P.2d 7]; 1 Witkin & Epstein, Cal. Criminal Law (2d. ed. 1988) Crimes Against the Person, § 486, pp. 548-549.) In contrast, manslaughter is the unlawful killing of a human being *without malice.* (§ 192; *People v. Forbs* (1965) 62 Cal.2d 847, 852 [44 Cal.Rptr. 753, 402 P.2d 825]; *People v. Coad* (1986) 181 Cal.App.3d 1094, 1106 [226 Cal.Rptr. 386]; 1 Witkin & Epstein, *supra,* §§ 487, 510, at pp. 549, 576-579.)

Malice, for the purpose of defining murder, may be express or implied. (§ 188.) It is express "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188; *People v. Mattison* (1971) 4 Cal.3d 177, 182 [93 Cal.Rptr. 185, 481 P.2d 193].) Implied malice is present "when no considerable provocation appears, or

---

[8]Section 417, subdivision (a)(2), provides in pertinent part: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor . . . ." Defendant was not charged with violating this statute (although the trial court instructed the jury pursuant to CALJIC No. 16.290—see fn. 6, *ante*). The felony portions of section 417 have no application to defendant's case.

when the circumstances attending the killing show an abandoned and malignant heart." (§ 188; *People* v. *Mattison, supra.*) ▇ Thus, the mental state comprising malice is independent of that encompassed within the concepts of willfulness, deliberation, and premeditation. (See §§ 187-189; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 722 [112 Cal.Rptr. 1, 518 P.2d 913] [disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 (160 Cal.Rptr. 84, 603 P.2d 1)]; *People* v. *Bender* (1945) 27 Cal.2d 164, 180-182 [163 P.2d 8]; *People* v. *Holt* (1944) 25 Cal.2d 59, 70 [153 P.2d 21].) Ill will toward, or hatred of, the victim are not prerequisites of malice as that term is used in the statutory definition of murder. (*People* v. *Sedeno, supra,* 10 Cal.3d 703; *People* v. *Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Bender, supra,* 27 Cal.2d at p. 180; 1 Witkin & Epstein, *supra,* Crimes Against the Person, § 488, pp. 550-552.) When it is established that the killing was the result of an intentional act committed with express or implied malice, no other mental state need be shown in order to establish malice aforethought. (§ 188.)

### B. *CALJIC No. 8.31*

Translation of the statutory elements of implied malice into plain, understandable jury instructions has undergone an evolutionary process. (See *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1217-1222 [264 Cal.Rptr. 841, 783 P.2d 200].) Initially, the controlling decisions upheld a jury instruction that relied on the statutory definition of implied malice, permitting the jury to find malice if the killing were done with "an abandoned and malignant heart." (See, e.g., *People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1] (conc. opn. of Traynor, J.).) Subsequent decisions determined, however, that such an instruction was too cryptic. (See, e.g., *People* v. *Sedeno, supra,* 10 Cal.3d at pp. 722-723; *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353].) In *People* v. *Phillips, supra,* we observed that an instruction which relies on the term "abandoned and malignant heart" invites confusion and unguided speculation, for it "could lead the jury to equate the malignant heart with an evil disposition or a despicable character; the jury, then, in a close case, may convict because it believes the defendant a 'bad man.'" (64 Cal.2d at p. 587, fn. omitted.)

Two lines of decisions developed, reflecting judicial attempts to "translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply." (*People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 162-163 [246 Cal.Rptr. 915]; see also *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1218.) One strand held that malice could be implied where "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result

in death." (*People* v. *Thomas, supra,* 41 Cal.2d at p. 480 (conc. opn. of Traynor, J.); see also *People* v. *Poddar* (1974) 10 Cal.3d 750, 756-757 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Conley, supra,* 64 Cal.2d at p. 321; *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130].) The alternate strand held that malice could be implied where the killing was proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People* v. *Phillips, supra,* 64 Cal.2d at p. 587; *People* v. *Sedeno, supra,* 10 Cal.3d at p. 719.)

In *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279], we observed that the language employed in defining implied malice in the two strands of cases was substantively similar. (*Id.* at p. 300.) We therefore concluded that second degree murder with implied malice has been committed "when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . . [Citations.] *Phrased in a different way,* malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]" (*Ibid.,* italics added, internal quotation marks deleted.)

Thus, we held in *Watson* that the two definitions of implied malice which had evolved from the foregoing cases actually articulated one and the same standard. (*People* v. *Watson, supra,* 30 Cal.3d at p. 300; *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1219.) As we observed in *Dellinger,* however, the drafters of the *fourth* edition of CALJIC, in formulating CALJIC No. 8.11 (an instruction virtually identical to CALJIC No. 8.31), substituted the disjunctive "or" for *Watson*'s transitional words, "[p]hrased in a different way." (49 Cal.3d at p. 1219.) This wording in the instruction caused confusion in the decisions of the Courts of Appeal as to whether the term "wanton disregard for human life" adequately conveyed the subjective-awareness component of implied malice. (*Ibid.,* citing the cases.) We concluded in *Dellinger* that instructing the jury with this term was adequate, but that due to the obscure phraseology of the term, the better practice in the future would be to charge juries "solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice." (*Id.* at p. 1221.) This preferred definition—without its counterpart of "wanton disregard for human life"—is set forth in the fifth edition (1988) versions of CALJIC Nos. 8.11 and 8.31, which we approved in *Dellinger.* (49 Cal.3d at p. 1222.)

### C. *Whether the trial court committed instructional error in responding to the jury's inquiry*

The issue presented in defendant's case, unlike that posed in *Dellinger, supra*, 49 Cal.3d 1212, does not turn on that portion of the implied-malice definition relevant to defendant's *state of mind*. Rather, the present controversy relates to the nature of *the act* (as the term is used in CALJIC No. 8.31) that can give rise to a conviction on a theory of implied malice.

As noted above, the jury in the present case asked the trial court to define the term "intentional act" as used in CALJIC No. 8.31. ██ ██ The court responded by informing the jury that "the pulling of a handgun in the manner described and/or the shooting of the handgun in the manner described are possible acts for your consideration. . . ."[9]

The People contend the trial court properly instructed the jury, and assert that brandishing a loaded firearm in a threatening manner, when viewed in context, may constitute a sufficiently dangerous act to support a finding that defendant acted with implied malice.

In reply, defendant contends that the trial court's response permitted the jury to imply malice from defendant's act of "pulling a handgun," an offense punishable as a misdemeanor under section 417, subdivision (a)(2). (See fn. 8, *ante*.) Defendant's contention rests on parallel assertions: (1) because the act of brandishing a firearm is not "inherently dangerous," it was insufficient to support a finding that defendant acted with implied malice; and (2) because (as noted by the Court of Appeal majority) the killing was "involuntary" and occurred in the commission of an unlawful act, not amounting to a felony (i.e., while defendant brandished a firearm), the death that resulted from defendant's act involved, at most, a manslaughter pursuant to section 192, subdivision (b), and not a murder. Defendant also contends, in an argument unrelated to the propriety of the trial court's response to the jury's inquiry, that CALJIC No. 8.31 misstates the law.

---

[9]Preliminarily, we reject defendant's claim, based on *People* v. *Harris* (1989) 47 Cal.3d 1047 [255 Cal.Rptr. 352, 767 P.2d 619], that the trial court's response to the jury's inquiry represented an improperly argumentative pinpoint instruction. No such impropriety appears, because the court's response did not imply a conclusion to be drawn from the evidence. (*Id.* at p. 1098, fn. 31.) Rather, in its response, the court admonished the jury not to view the court's explanation of the phrase "intentional act" as "a comment . . . on the evidence or a suggestion by the court on what you should find to be the facts." The court's response mirrored the earlier, standard instruction which it gave: "Whether some instructions will apply will depend on what you find to be the facts. . . . Do not conclude that because an instruction has been given that I [am] expressing an opinion as to the facts." (CALJIC No. 17.31.)

We agree with the People that the trial court properly instructed the jury and, for the reasons set forth below, conclude that defendant's assertions are without merit.

 1. *In determining whether implied malice was shown, the jury was not required to consider "in the abstract" the offense of brandishing a firearm*

■ Defendant contends his *act* of brandishing a firearm cannot supply the implied malice necessary to support a murder conviction. In advancing this argument, defendant seeks to focus attention on the nature of the underlying act "in the abstract," rather than on defendant's specific course of conduct in the present case. As we shall explain, however, defendant's argument is based upon a distinct body of law that interprets the felony-murder rule and is thus inapplicable in the present context.

■ Where the felony-murder rule is applicable, a court looks to the underlying felony in the abstract in order to determine whether the underlying felony was so inherently dangerous that malice can be ascribed to the defendant without reference to the particular facts of the case. (See, e.g., *People* v. *Patterson* (1989) 49 Cal.3d 615, 622-626 [262 Cal.Rptr. 195, 778 P.2d 549] [furnishing cocaine]; *People* v. *Burroughs* (1984) 35 Cal.3d 824, 829-833 [201 Cal.Rptr. 319, 678 P.2d 894] [practice of medicine without a license]; *People* v. *Henderson* (1977) 19 Cal.3d 86, 93-96 [137 Cal.Rptr. 1, 560 P.2d 1180] [aggravated false imprisonment]; *People* v. *Phillips, supra,* 64 Cal.2d at pp. 582-585 [chiropractor's misrepresentations]; *People* v. *Williams* (1965) 63 Cal.2d 452, 458 [47 Cal.Rptr. 7, 406 P.2d 647] [conspiracy to possess Methedrine].) " 'The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally, by holding them strictly responsible for killings they commit' " during the course of enumerated felonies. (*People* v. *Mattison, supra,* 4 Cal.3d at p. 185; *People* v. *Washington, supra,* 62 Cal.2d at p. 781.) For certain felonies deemed inherently dangerous to human life, the rule operates to render irrelevant any evidence of actual malice or of the lack thereof. (*People* v. *Satchell* (1971) 6 Cal.3d 28, 43 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 475 [194 Cal.Rptr. 390, 668 P.2d 697].)

■ In contrast, a murder committed with implied malice requires that the prosecution demonstrate the defendant in fact acted with malice. (See *People* v. *Protopappas, supra,* 201 Cal.App.3d at pp. 162-164.) The concept of implied malice has both a physical and a mental component. (*People* v. *Patterson, supra,* 49 Cal.3d at p. 626.) The physical component is satisfied by the performance of " 'an act, the natural consequences of which are

dangerous to life.' " (*Ibid.*, quoting *People* v. *Watson*, *supra*, 30 Cal.3d at p. 300.) The mental component, as set forth earlier, involves an act " 'deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . .' " (*People* v. *Dellinger*, *supra*, 49 Cal.3d at pp. 1218-1219.) Whether a defendant's underlying acts are inherently dangerous *in the abstract* is not dispositive in the jury's determination as to whether a defendant acted with malice.

Thus, the analytical approach applicable to murder committed with implied malice differs significantly from that applicable to felony murder. (See *People* v. *Dillon*, *supra*, 34 Cal.3d at pp. 476-477; see also *People* v. *Patterson*, *supra*, 49 Cal.3d at p. 629 ["Notions of implied malice have never before been imported into felony murder . . . ."] (conc. and dis. opn. of Lucas, C. J.).) Nevertheless, by arguing that misdemeanor brandishing of a firearm is not inherently dangerous, defendant attempts to borrow from the analysis applicable to felony murder in order to escape the applicability of the principles involved in the concept of implied malice. Defendant's contention lacks support. Numerous cases have held that even where the felony-murder rule is inapplicable because the underlying felony is not inherently dangerous, the defendant still may be tried on a theory of implied malice. (See, e.g., *People* v. *Satchell*, *supra*, 6 Cal.3d at p. 43 [ex-felon's possession of concealed firearm]; *People* v. *Lopez* (1971) 6 Cal.3d 45, 53 [98 Cal.Rptr. 44, 489 P.2d 1372] [escape from county jail]; see also *People* v. *Fuller* (1978) 86 Cal.App.3d 618, 628-629 [150 Cal.Rptr. 515]) [upholding application of felony-murder rule in case involving high-speed automobile chase, and observing that defendants also could be prosecuted on a theory of implied malice]; 1 Witkin & Epstein, *supra*, Crimes Against the Person, § 494, pp. 558-559.)

 By asserting that the jury, in considering the matter of implied malice, should have limited its inquiry to the inherent dangerousness of the offense of brandishing a firearm, defendant seeks to diminish the significance of the circumstances surrounding his own conduct. The very nature of implied malice, however, invites consideration of the circumstances preceding the fatal act. (See *People* v. *Goodman* (1970) 8 Cal.App.3d 705, 708 [87 Cal.Rptr. 665] [conviction of murder with implied malice upheld where underlying intentional act was assault with a deadly weapon], disapproved on other grounds, *People* v. *Beagle* (1972) 6 Cal.3d 441, 451-452 [99 Cal.Rptr. 313, 492 P.2d 1]; see also CALJIC No. 8.11.) The "natural consequences" (*People* v. *Watson*, *supra*, 30 Cal.3d at p. 300) of a person's act in brandishing a firearm necessarily relate to the context in which the act was committed: for example, the brandishing (and subsequent discharge) of a firearm during a heated dispute justifiably could lead a jury to reach a

verdict different from one which might be reached in a case involving an accidental shooting during a friendly hunt for wild game. Thus, in determining in the case at bar whether defendant intentionally committed an act "the natural consequences of which are dangerous to life" (*ibid.*), the jury was entitled to consider all of the events leading up to the shooting—defendant's dispute with, and threats directed toward, the victim, as well as defendant's retrieval of a loaded handgun and extra ammunition, his prompt return to the scene of the argument, his initiation of the final confrontation, and his drawing of the loaded handgun with his finger on the trigger as the victim lunged toward him.

 For the foregoing reasons, we reject defendant's assertion that the trial court erred in not limiting the jury to consideration of the underlying offense in the abstract.[10]

### 2. *Death resulting from the commission of a misdemeanor can support a murder conviction if malice is shown*

██ Defendant contends the jury's finding that he acted with implied malice suggests that the shooting was accidental. Defendant further contends that an unlawful killing resulting from the accidental discharge of a firearm, even one brandished in violation of section 417, is, at most, manslaughter. In support of this argument, defendant relies on the provisions of section 192, subdivision (b), which define manslaughter to include an "unlawful killing of a human being without malice [¶] . . . [¶] . . . in the commission of an unlawful act, not amounting to a felony . . . ."

██ Defendant's argument rests on a misinterpretation of section 192, subdivision (b). The statute does not classify *all* killings resulting from the commission of a misdemeanor as manslaughter. Rather, the statute's threshold provision—ignored by defendant—is that only those unlawful killings committed *without malice* are defined as manslaughter. (§ 192.) It is well established that a defendant who commits an unlawful killing with malice, but whose underlying offense is classified as a misdemeanor, is not insulated by that classification from liability for murder.

In *People* v. *Hubbard* (1923) 64 Cal.App. 27 [220 P. 315], the defendant's pistol discharged during a dispute in which he had attempted to eject the

---

[10]Defendant, joined by amici curiae, also argues that unless a jury considers the inherent dangerousness of the underlying offense, it would be prone to elevating *any* manslaughter to murder. We disagree. The trial court's standard instructions properly informed the jury that the presence of malice aforethought was the critical element that distinguishes murder from manslaughter. *If* the jury had determined that defendant lacked malice aforethought, it then would have been required to examine the nature of defendant's underlying misdemeanor in determining whether defendant was guilty of involuntary manslaughter. (§ 192, subd. (b); CALJIC No. 8.45.)

victim, an intruder, from his residence. The defendant in that case testified that he neither removed the safety device nor pulled the trigger, but instead had waved the pistol in an effort to "bluff" the intruder. He testified further that the weapon fired accidentally during the ensuing fracas. The appellate court reversed a judgment of second degree murder based on the trial court's failure to give a requested instruction regarding the defendant's right to use reasonable force to eject the intruder. The court observed, however, that even if the defendant's underlying act of waving the pistol were found to constitute a violation of the law (a misdemeanor), the *unintentional* killing still could be *murder* if the jury determined that the natural consequences of the unlawful act were dangerous to human life. (*Id.* at pp. 37-38.) In such a situation, malice is implied. (*Id.* at p. 38.)

In *People* v. *Curry* (1961) 192 Cal.App.2d 664 [13 Cal.Rptr. 596], the defendant initially fired his rifle at a construction crew working in a nearby apartment building. The police were notified and, as they encircled the defendant's residence, he fired his rifle again, killing one of the officers. In affirming the defendant's conviction of second degree murder on an implied-malice theory, the appellate court rejected the defendant's challenge to the following jury instruction: " 'Murder may be committed without a specific intent to take human life. To be so committed, however, the defendant must intend to commit acts that are likely to cause death and that show a conscious disregard for human life. [¶] Thus if the natural consequences of an unlawful act be dangerous to human life, then an unintentional killing proximately caused by such act will be murder in the second degree, even though the unlawful act amounted to no more than a misdemeanor. In such case, the malice aforethought is implied from the wanton recklessness.' " (*Id.* at pp. 674-675.) The appellate court upheld the instruction as "a correct statement of the law." (*Id.* at p. 675.)

More recently, in *People* v. *Benson* (1989) 210 Cal.App.3d 1223 [259 Cal.Rptr. 9], the defendant entered the bedroom of an acquaintance, brandishing a pistol and demanding that the acquaintance return defendant's makeup bag. An argument ensued, the gun fired, and the acquaintance died from the resulting gunshot wound. The defendant argued at trial that the gun fired accidentally when the victim's sister charged into the bedroom. In affirming defendant's conviction of second degree murder on a theory of implied malice, the appellate court determined that the defendant's conduct—entering an acquaintance's bedroom while brandishing a loaded handgun—supported the jury's finding of implied malice. (*Id.* at pp. 1228-1231.)

Other authority also supports the People's contention that, where the defendant obtains a lethal weapon and then engages the victim in an

argument, malice may be implied—from the circumstances leading to the killing—to support a conviction of second degree murder. (See, e.g., *People v. Rosenkrantz* (1988) 198 Cal.App.3d 1187 [244 Cal.Rptr. 403] [defendant, incensed that his younger brother and an acquaintance had discovered defendant's homosexuality, purchased a semiautomatic weapon, went to the acquaintance's residence armed with the weapon, engaged him in an argument, and then fatally shot him]; *In re Russell H.* (1987) 196 Cal.App.3d 916 [242 Cal.Rptr. 488] [minor's retrieval of a handgun for the purpose of coercing a drug seller to give him drugs, followed by an argument and discharge of the weapon, resulting in unintentional death of victim]; *People v. Summers* (1983) 147 Cal.App.3d 180 [195 Cal.Rptr. 21] [defendant's efforts in locating intended victim, making a special trip to arm himself with a concealed weapon, and then producing the weapon in a threatening fashion in victim's presence provided ample evidence of defendant's implied malice to support second degree murder conviction]; *People v. Love* (1980) 111 Cal.App.3d 98 [168 Cal.Rptr. 407] [following argument between defendant and victim over use of victim's vehicle, defendant placed gun near victim's head and, after victim continued to argue, pulled the trigger].)

██ Thus, the classification of the underlying offense as a misdemeanor does not in itself preclude a resulting death from constituting murder. The circumstance that an act may be punishable as a misdemeanor does not render it incapable of being performed in a manner that, under the circumstances, is sufficiently dangerous to human life to support a jury's finding of implied malice. ██ ██ ██ Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice. (See *People v. Hubbard, supra,* 64 Cal.App. at p. 38; *People v. Benson, supra,* 210 Cal.App.3d at pp. 1228-1230; *In re Russell H., supra,* 196 Cal.App.3d at pp. 919-923; see also *People v. Watson, supra,* 30 Cal.3d at pp. 296-301.)[11]

D. *CALJIC No. 8.31 correctly states the law*

Defendant did not challenge the accuracy of CALJIC No. 8.31 at trial. He did not object to the giving of the instruction, nor did he request any

---

[11]We also reject defendant's assertion, joined by the Orange County Public Defender as amicus curiae, that the jury's question regarding the meaning of "intentional act" demonstrated the jury's uncertainty regarding the issue of causation. Defendant contends that in light of this purported uncertainty, the trial court had a sua sponte duty to furnish an additional instruction on causation. (See *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 590-591 [35 Cal.Rptr. 401].) We disagree. It is apparent that the uncertainty revealed by the jury's inquiry related to the meaning of "intentional act" as that term is used in CALJIC No. 8.31 (see fn. 7, *ante*), and not to the matter of causation. The answer given by the trial court was responsive to the jury's question.

additional instruction explaining that, for the purpose of determining the existence of implied malice, "an act" is one "the natural consequences of which are dangerous to life" *only* when there is "a high probability that [the act] will result in death." (See *People* v. *Watson, supra,* 30 Cal.3d at p. 300.)

██ On appeal, however, defendant contends that CALJIC No. 8.31 misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that death will result. (See *People* v. *Watson, supra,* 30 Cal.3d at p. 300.) Defendant argues that such a requirement articulates an elevated standard above that which is incorporated in the current version of CALJIC No. 8.31, which requires an act whose "natural consequences" are dangerous to life. A former version of CALJIC No. 8.31 included the requirement of a "high probability" of death. (*People* v. *Dellinger, supra,* 49 Cal.3d at p. 1217, citing CALJIC No. 8.31 (1983 rev.) (4th ed. pocket pt.).) The State Public Defender, as amicus curiae, urges us to instruct the lower courts that, in a retrial of the present case and in future cases, the high-probability requirement should be reinstated in the instructions defining second degree murder.

We conclude, however, that the present CALJIC No. 8.31 correctly distills the applicable case law. (See *People* v. *Patterson, supra,* 49 Cal.3d at p. 626 [the physical component of implied malice "is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life' " (quoting *People* v. *Watson, supra,* 30 Cal.3d at p. 300)]; *People* v. *Sedeno, supra,* 10 Cal.3d at p. 719; *People* v. *Phillips, supra,* 64 Cal.2d at p. 587.) As noted earlier, we indicated in *People* v. *Watson* that the two linguistic formulations—"an act, the natural consequences of which are dangerous to life" and "an act [committed] with a high probability that it will result in death" are equivalent and are intended to embody the same standard. (*People* v. *Watson, supra,* 30 Cal.3d at p. 300; see also *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1219 ["*Watson* thus made it abundantly clear that the two definitions of implied malice which evolved in the aforementioned cases articulated one and the same standard."].) Accordingly, we find no error in the trial court's use of CALJIC No. 8.31 and decline amicus curiae's invitation to recommend modification of the instruction. (See *People* v. *Dellinger, supra,* 49 Cal.3d at p. 1222 ["We approve of this newly revised malice instruction [referring to CALJIC Nos. 8.11 and 8.31]."].)

██ Nor did the court respond improperly to the jury's inquiry regarding CALJIC No. 8.31. The court admonished the jury that the word "act" had to be understood in the context of the various requirements of CALJIC No. 8.31. The jury therefore was made aware that it was obligated to determine whether: (1) defendant's drawing his loaded firearm, while facing the victim

at point-blank range, was an intentional act; (2) the natural consequences of that act were dangerous to human life; and (3) the act was performed with knowledge of the danger to, and conscious disregard for, human life. The court's response did not misdirect the jury or relieve the prosecution of its burden of proving that defendant acted with malice.[12]

IV. CONCLUSION

We reverse the judgment of the Court of Appeal and remand the matter to that court with directions to affirm the judgment of the trial court.

Lucas, C. J., Panelli, J. Arabian, J., and Baxter, J., concurred.

**MOSK, J.**—I concur generally with the majority opinion. I write separately because I fear that in a different case the jury may misconstrue the standard instructions on second degree murder on a theory of implied malice. (CAL-JIC Nos. 8.11 & 8.31 (5th ed. 1988 bound vol.).)

Penal Code[1] sections 187 and 188 define murder and malice. Subdivision (a) of section 187 provides that "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." "Such malice," continues section 188, "may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or [as relevant here] when the circumstances attending the killing show an abandoned and malignant heart."

The jury was instructed in the elements of murder. Because the term "abandoned and malignant heart" is opaque to the average juror, the jury was told in accordance with CALJIC Nos. 8.11 and 8.31 that it could return a verdict for second degree murder if it found that defendant had killed the victim and "1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." As the majority opinion notes, the jury specifically found defendant guilty of second degree murder on the basis of "implied (not express) malice."

In *People* v. *Dellinger* (1989) 49 Cal.3d 1212, 1221-1222 [264 Cal.Rptr. 841, 783 P.2d 200], we approved the language of the current version of

---

[12]Because nothing in the record indicates that the trial court relieved the prosecution of its burden of establishing that defendant acted with malice, we reject defendant's claim that he was denied his constitutional right to due process of law. (Compare *Yates* v. *Aiken* (1988) 484 U.S. 211, 214-217 [98 L.Ed.2d 546, 552-554, 108 S.Ct. 534].)

[1]Unlabeled section references are to this code.

CALJIC Nos. 8.11 and 8.31. We relied on *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279] (*Watson*). *Watson* declared that implied malice exists "when a person does an act, the natural consequences of which are dangerous to life . . . . Phrased in a different way, malice may be implied when [the] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. (*People* v. *Washington* (1965) 62 Cal.2d 777, 782 [44 Cal.Rptr. 442, 402 P.2d 130].)" (*Id.* at p. 300, internal quotation marks omitted.) *Watson* also stated that "Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence . . ." (*id.* at p. 296), and that ". . . malice may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life. . . ." (*ibid.*, italics deleted).

As the majority opinion observes, by harmonizing the language of a long line of cases *Watson* culminated a decades-long effort to interpret for the jury section 188's cryptic "abandoned and malignant heart" language. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 719, 722-723 [112 Cal.Rptr. 1, 518 P.2d 913]; *People* v. *Poddar* (1974) 10 Cal.3d 750, 757 [111 Cal.Rptr. 910, 518 P.2d 342]; *People* v. *Phillips* (1966) 64 Cal.2d 574, 587 [51 Cal.Rptr. 225, 414 P.2d 353]; *People* v. *Conley* (1966) 64 Cal.2d 310, 321 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130]; *People* v. *Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1] (conc. opn. of Traynor, J.).)[2] Justice Traynor's oft-quoted concurring opinion in *Thomas* stated that implied malice "is shown when . . . the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death." (41 Cal.2d at p. 480.) The concurring opinion provided examples (*id.* at p. 479) from four cases decided in the district Courts of Appeal: striking the victim with a knife; firing a shotgun at trespassers; shooting with intent to wound; and, in a variation on the classic illustration of "depraved heart" second degree murder, firing shots at random into a crowded dance hall. (See, e.g., *People* v. *Roberts* (1992) 2 Cal.4th 271, 317 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

In 1983 the Legislature adopted the "high probability of death/natural consequences" standard this court set forth in *Watson* for implied malice.

---

[2]*People* v. *Sedeno*, *supra*, was disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, footnote 12 [106 Cal.Rptr. 84, 603 P.2d 1]. *People* v. *Poddar* and *People* v. *Conley*, both *supra*, were overruled on another point in *People* v. *Saille* (1991) 54 Cal.3d 1103, 1113-1114 [2 Cal.Rptr.2d 364, 820 P.2d 588].

(Stats. 1983, ch. 937, § 1, p. 3387, amending § 192.)[3] Therefore, even if I agreed with amicus curiae the State Public Defender that the "high probability of death" language requires a graver act than the "natural consequences dangerous to life" language, and believed that the Legislature's original "abandoned and malignant heart" formulation also set a high standard for the necessary physical act, my view would be purely academic, for the Legislature has decided that the two phrases are synonymous.

But as the State Public Defender observed at oral argument, the fact that lawyers, judges, and others versed in the law may recognize *Watson's* equivalence does not mean that a lay juror necessarily will be able to do so. A problem could well arise in some cases because the language now set forth in CALJIC Nos. 8.11 and 8.31 is technical and abstract and hence less readily understood than the "high probability of death" language. The instructions might therefore cloud a juror's ability to discern whether the facts warrant a murder conviction—especially because the jury would be faced with the certainty that death had occurred.

In determining whether an instruction is erroneous or not, we ascertain whether there is a reasonable likelihood that the jury misconstrued the words in the context of an individual case. (*People* v. *Clair* (1992) 2 Cal.4th 629, 662-663, 688 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Though there was no such likelihood here, in another case a reasonable likelihood may arise. Consider a situation in which, in a remote part of a rural county, a hunter, for no apparent reason, fired a bullet into the air at a 45-degree angle, causing a human death on the ground some distance away. The act was illegal because it "could result in injury or death" (§ 246.3), and was somewhat dangerous even though performed in a thinly populated area. But let us further hypothesize that death as a result was a freak occurrence: there was uncontested evidence that the bullet was far more likely to strike the ground or a tree than a human being. There was no high probability that the act would result in death; the act's natural consequences were not dangerous to human life. But the "natural consequences dangerous to life" language is vague enough to those unschooled in the nuances of the law of homicide that a lay jury might nevertheless vote to convict the hunter of implied-malice murder. If a reviewing court concluded there was a reasonable likelihood the jury misconstrued the instruction, the judgment of conviction would be reversed.

Under the previous versions of those instructions—which gave the high probability language (CALJIC Nos. 8.11, 8.31 (4th ed. 1979 bound vol.))—

---

[3]Section 192 now provides that " 'Gross negligence', as used in this section [to help define vehicular manslaughter], shall not be construed as prohibiting or precluding a charge of murder under Section 188 upon facts exhibiting wantonness and a conscious disregard for life to support a finding of implied malice, or upon facts showing malice, consistent with the holding of the California Supreme Court in People v. Watson 30 Cal.3d 290."

the jury would readily understand the task it faced, for the language was forthright and clear.

To avoid reversals of judgments of conviction that might otherwise be required, I believe we should encourage the trial courts to give the clearest possible exposition of section 188. We have striven for decades to do so, most recently in *Watson, supra*, 30 Cal.3d 290, and *People* v. *Dellinger, supra*, 49 Cal.3d 1212. The clearest language describing the nature of the physical act required to establish implied malice is *Watson*'s formulation that the act must have contained a high probability that death would result. The Legislature has approved this standard (§ 192), and we have never retreated from it. The trial courts would be on safe ground to recite it to the jury.

Kennard, J., concurred.