Filed 3/28/13  P. v. Martinez CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN MARTINEZ,<br><br>    Defendant and Appellant. | B239357<br><br>(Los Angeles County<br>Super. Ct. No. MA046718) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lisa M. Chung, Judge.  Affirmed.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant Jonathan Martinez was convicted, following a jury trial, of two counts of second degree murder in violation of Penal Code section 187, subdivision (a).[1] The jury found true the allegations that the murders were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(4) and also found true various firearm allegations, including one pursuant to section 12022.53, subdivision (d). The trial court sentenced appellant to 15 years to life in state prison for each murder conviction, plus a 25 years to life enhancement term for each conviction for the firearm allegation, for a total of 80 years to life in state prison.

Appellant appeals from the judgment of conviction, contending that there is insufficient evidence to support his convictions. We affirm the judgment of conviction.


Facts

On August 30, 2009, a group of people were gathered at the Giron home on Poseidon Drive in Palmdale. The gathering was a continuation of a birthday party which had begun at another house. About 1:00 a.m., five of the attendees were in the garage with the door open. Francisco Govea saw two women and three or four men standing around his Suzuki, which was parked across the street. One of the men was appellant. Some members of the group were leaning on the Suziki or sitting on it. Francisco asked the group to get off his "Mercedes-Benz." They did not. Francisco's girlfriend, Ashley, yelled at the women to get off the car. The women across the street then became involved in a verbal exchange with Ashley, Candice Giron and Candice's sister, Stephanie. The women began to walk toward each other.

Francisco and two other men from the party, Pablo Reyes and David Martinez, walked out to make peace. Just as it appeared that the confrontation had been resolved, Candice's brother-in-law, Chris Flores, took off his shirt and yelled his gang affiliation, "CKF." The men in the group by the car all responded "DAF." DAF was a rival gang. One of the men, Jorge Linares, took off his shirt and ran toward Flores. They met in the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

middle of the street and yelled profanities at each other. Flores did not have a gun, and did not reach into his clothes and pretend that he had one. Candice placed herself between the two men. She told Linares that they did not want any trouble because there were children in the house.

Appellant drew a gun and asked, "You guys are all from CKF?" Peter Giron said, "None of us are from a gang." He put his hand on appellant's hand and moved the gun downward. At the same time, Francisco and Pablo kept trying to pull Flores back into the house. When Flores saw appellant's gun, he began to back up. The situation seemed to have calmed down, and no one was yelling anymore.

As the group from the Giron house reached the lawn of the house, a white Stratus drove up. Appellant fired in Flores's direction. The two men were about 30 feet apart. Peter turned around and saw appellant fire four more shots in the direction of the house. Appellant and all the other DAF gang members then got into the white car and left.

Francisco and Pablo received gunshot wounds, were taken to the hospital for treatment and eventually died. Flores was not hurt.

Witnesses from the Giron house group, including Flores, testified that Flores did not have any kind of weapon during this encounter. Steve Cuatro, who also witnessed the shooting, agreed that Flores did not have a gun or knife or any kind of weapon when he yelled his gang name and confronted appellant, or at any time thereafter. Cuatro was a member of DAF at the time of the shooting. He subsequently decided to leave the gang and had his gang tattoos removed. Cuatro's account of events was essentially the same as the accounts given by the people from the Giron house.

Los Angeles County Sheriff's Deputy Robert McGaughey arrived at the Giron house shortly after the shooting. He interviewed people at the scene and learned information about another nearby location on East Avenue R-12. Deputy McGaughey drove Peter and Flores to that location. Six or seven individuals had been detained there.

3

Flores and Peter each identified appellant as the shooter and Jorge Linares as the man who challenged Flores to a fight. Also present were Manuel Garcia and Randy Trujillo.[2]

Sheriff's Detective Philip Guzman collected expended casings and bullet fragments from the scene. He also collected a revolver from the residence on East Avenue R-12 where appellant and his companions were discovered. Later, Detective Guzman collected two bullet fragments from Pablo's body during his autopsy. Tests showed that the bullet fragments found at the scene of the shooting and in Pablo's body were fired from the revolver recovered from the residence on East Avenue R-12.

At trial, Sheriff's Deputy Daniel Welle testified as a gang expert. He testified that DAF was a criminal street gang whose primary activities were the commission of violent crimes such as assault, attempted murder and murder. He opined that appellant was a DAF gang member, and that Linares and Garcia were as well. He further opined that Flores was a member of the CKF gang.

Deputy Welle also testified that DAF and the CKF gang were rivals. Both claimed to be the original gang in Palmdale. There was graffiti on a mailbox across the street from the Giron residence which showed the names of rivals of the DAF gang. The names were crossed out. Deputy Welle did not know when the graffiti was placed there.

Deputy Welle explained that respect was important in the gang culture. Gang members gained respect by committing violent crimes for their gang or crimes that brought in revenue. Deputy Welle was given a hypothetical based on the facts of this case. He opined that such a crime would be for the benefit of the gang. He explained that the shooter would have felt disrespected by being told to move away from the car and also by the confrontation with a member of a rival gang, particularly since the shooter's gang was the larger of the two groups. The shooter would have to shoot to prevent a loss of credibility and respect.

---

[2] Linares, Garcia and Trujillo were also charged in the murders, but are not parties to this appeal.

4

Appellant testified in his own behalf. He admitted that he was a member of DAF, but said that he had joined to avoid being harassed by a tagging crew. On the night of the shooting, he went with Linares, Garcia, Trujillo and Steve Cuatro to a party. They left with two girls and milled around in the street. Appellant walked off with one of the girls, Crystal. She leaned on a green car while talking to him. Others joined them.

At some point, four men walked over from a house across the street. One said, "Get the fuck away from my Mercedes Benz." Crystal began arguing with the men. Flores jogged up to appellant and Crystal, took his shirt off and said, "I'm from Varrio CKF. I will kill you and that bitch." Appellant pulled out a gun but did not point it at Flores. Peter grabbed appellant's hand, pushed the gun down and said that he did not want any problems. Appellant replied that he did not want any problems either. Peter walked toward Flores and tried to calm him down. Flores was struggling with two men who were trying to drag him away. Flores said several times, "I will kill you and the bitch."

At some point, Flores broke free and ran toward appellant. Appellant pulled out his gun, closed his eyes and fired because he was afraid for his life. Appellant admitted that he did not see Flores with a weapon.

Appellant acknowledged that he initially told detectives that he knew nothing about the shooting, but claimed that he was lying. He also lied when he told police that he did not know codefendant Garcia very well and when he said that someone named Kalina dropped him off at the house on East Avenue.

Discussion

Appellant contends that there is insufficient evidence to support his convictions for murder and that such convictions violate his state and federal rights to due process. Specifically, appellant contends that the evidence showed an absence of malice aforethought and that the killings were at most voluntary manslaughter due to imperfect self-defense. He also contends that evidence showed that the killings were done in self-defense and so were justified.

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]'" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Murder is the unlawful killing of a human being with malice aforethought. (§ 187.) Malice may be express or implied. (§ 188.) Malice is express when "there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (*Ibid.*) Malice may be implied "'when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . .'" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104.)

When a defendant kills in imperfect self-defense, the killing is voluntary manslaughter because it lacks malice aforethought. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) A defendant acts in imperfect self-defense if he has an "actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril." (*Id*. at p. 1178.)

When a defendant kills in self-defense, the killing is justified and he commits no crime. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.) A defendant acts in self-defense if he "actually and reasonably" believes in the need to defend himself from imminent harm. (*Id*. at p. 1082.)

6

Here, appellant testified at trial that when Flores confronted Linares, he said, "What's up I will kill you." Even when Flores was restrained by others, he continued to tell appellant that he would kill him and struggled to get free to get at appellant. Appellant also testified that he believed that Flores had a weapon due to Flores's body language. Appellant acknowledged that he did not see any weapon. Appellant further testified that Flores broke free and ran toward appellant. Appellant fired out of fear for his life.

We will assume for the sake of argument that appellant's testimony, if believed by the jury, was sufficient to show imperfect self-defense. The jury was not required to believe appellant. They could have chosen not to believe him for any number of reasons, including intangibles such as body language. Further, there was testimony from Cuatro and members of the Giron house group that painted a different picture of events. Those individuals testified that at the time the shooting occurred, things had calmed down, no one was exhibiting hostile behavior and everyone from their group, including Flores, was on the lawn of the Giron house. No one saw Flores with a weapon, and Flores denied having one. The jury could have reasonably believed that testimony and on that basis rejected appellant's version of events, including his claim of fear. On appeal, the court does not reweigh evidence or reevaluate a witness's credibility. (*People v. Nelson, supra*, 51 Cal.4th at p. 210.)

We reach the same conclusion concerning perfect self-defense. Even assuming for the sake of argument that the facts as recounted by appellant are sufficient to show perfect self-defense, the jury was not required to accept appellant's version of events. The jury could have accepted the account of Cuatro and the individuals from the Giron house. Under those facts, the jury could reasonably have concluded that no reasonable person would have believed that he was in imminent danger of death or great bodily injury.

To the extent that appellant contends that the prosecutor failed to prove the absence of perfect and imperfect self-defense, we do not agree. The prosecution presented evidence which, if believed by the jury, created a reasonable inference that no

form of self-defense was warranted.  The undisputed facts showed that appellant was with several friends and had a gun.  Those facts also showed that Flores was acting alone and was unarmed, and that his friends were attempting to restrain him.  Further, prosecution witnesses testified that Flores was about 30 feet away from appellant when appellant fired.  No reasonable person would believe that he was in imminent danger under such circumstances.

The prosecution also offered evidence, which if believed, showed that appellant was not acting out of actual but unreasonable fear.  Appellant claimed that Flores broke free and rushed toward him, causing him to fear imminent harm.  Flores acknowledged that he broke free but claimed that appellant immediately fired his weapon.  He denied running toward appellant just before the shots were fired.  Thus, the facts as presented by prosecution witnesses contradicted the factual basis of appellant's claimed fear.  Further, the prosecution presented evidence that showed that appellant was acting for a reason other than fear.  Expert testimony on gang culture showed a motive for appellant to shoot Flores other than fear:  to prevent losing respect within the gang.  There was undisputed testimony that immediately before the shooting, a white Stratus drove up, and that appellant and his companions left in the Stratus immediately after the shooting.  This is evidence that appellant planned the shooting, which contradicts his claim of fear.

Since we have determined that "a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15, of the California Constitution."  (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

8

Disposition

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ARMSTRONG, J.


We concur:


TURNER, P. J.


KRIEGLER, J.

9