Filed 5/20/25  P. v. Xavier CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JENNIFER RAE XAVIER, <br><br> Defendant and Appellant. | D083589 <br><br><br> (Super. Ct. No. SCD291005) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Patrick Morgan Ford, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Eric Tran, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jennifer Rae Xavier of a second degree *Watson*[1] murder and other crimes for driving drunk on the freeway, crashing her vehicle upside down into a creek, then leaving to go home while her

---

[1]    *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

passenger drowned. She appeals from the judgment, asserting: one claim of evidentiary error relating to the admission of a text message from the victim; one claim of instructional error relating to the implied malice element of a *Watson* murder; two claims of insufficient evidence, one as to her conviction for implied malice murder and the other as to her conviction for fleeing the scene of an accident causing death; six instances of prosecutorial misconduct; and cumulative error. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of March 4, 2021, Xavier went out in Pacific Beach with her friend Sidnie Waller. Xavier was driving. Before they left, Xavier drank an alcoholic beverage. The two went to a bar for drinks, to dinner, and then back to the bar for more drinks.

At around 8:50 p.m., Xavier and Waller left Pacific Beach, and Xavier drove south on the I-5 freeway. Between 9:02 and 9:04 p.m., about one minute before the vehicle crashed, Waller exchanged the following messages with her boyfriend, Jacob Mendez:

| "[Waller:] | Omg she's so sketch this is not okay |
|---|---|
| "[Mendez:] | Uhhh I'm stressing out |
| | I don't want you to get hurt |
| "[Waller:] | Please pray for me |
| | I'm so scared |
| "[Mendez:] | Sidnie |
| "[Waller:] | I'm not joking |
| "[Mendez:] | Just drive |
| | Tell her |
| "[Waller:] | She's not okay |
| "[Mendez:] | Dude |
| | She can kill you |
| "[Waller:] | She's not listening |
| "[Mendez:] | That's not okay |
| "[Waller:] | Please fucking pray |
| "[Mendez:] | Babe, tell her!! |
| | [You're] stressing me out |

2

Call me when [you're] home"

Waller did not respond to Mendez's further messages.

Waller also exchanged messages with her brother, but they were not time stamped:

"[Waller:]  I'm so scared
"[Brother:]  Y
"[Waller:]  Jacob, I might get into an accident
       Pray for me
"[Brother:]  Why
"[Waller:]  I'm fucking terrified
       Jenny drank so much and took a bar[2]
"[Brother:]  Drive her car
       Tell her
"[Waller:]  No I can't I drank too
       She won't listen
"[Brother:]  Uber dude
"[Waller:]  Oh my god
"[Brother:]  Your [*sic*] okay
       Make sure she's doing okay
       Make sure you['re] wearing your seatbelt sid
       please
       Be careful be smart
"[Waller:]  I am
       I'm gonna be sick holy shit this is so scary
       I have no control over anything
"[Brother:]  Is she driving okay?
"[Waller:]  No
       She's swerving all over
"[Brother:]  Ughhh
"[Waller:]  Almost ran into five cars.
"[Brother:]  How [far] are you . . .
"[Waller:]  Like 3 min

---

[2] "A bar" is a slang term that refers to Xanax, which is controlled substance and requires a prescription. It is a central nervous system depressant that causes similar effects to alcohol, such as slurred speech and loss of coordination. When mixed together, the effects of Xanax and alcohol add to each other.

According to a witness, Xavier drove in an "Exit Only" lane before making an "extreme" and "aggressive" lane change at a high speed back onto the main freeway. At around 9:05 p.m., the vehicle made an abrupt right turn at a high speed near the freeway exit and drove off the road into adjacent vegetation. The witness called 911 because the vehicle's erratic driving was so shocking. Based on his observation, the witness believed the driver might be drunk because "[n]o one in their right state of mind would decide, unless they were suicidal or something, to turn like that off the freeway."

After missing the freeway exit, the vehicle went airborne, turned over, and landed upside down in a creek, mostly submerged in water. Xavier managed to escape the car, returned to the freeway, ran into a lane, and waved at traffic. One driver swerved to avoid Xavier, spun around, and crashed on the side of a hill.

Meanwhile, Waller remained in the passenger seat of the overturned vehicle, submerged in water. Emergency personnel extricated Waller from the passenger side of the vehicle. No other individual was present at the scene. Waller was not breathing and had no pulse. Emergency personnel performed CPR and brought her to the hospital. Although Waller was successfully resuscitated, she had already suffered brain damage due to lack of oxygen and died three days after the crash. The cause of death was complications of drowning with contributing blunt force head injury.

Rodrigo Maia testified as to Xavier's whereabouts following the crash. He was driving on the freeway as Xavier desperately waved and asked for help. Xavier entered his car and asked him to take her home. She was wet, had a bit of blood on her face, smelled of alcohol, and was not carrying a purse or cell phone. Despite asking him to take her home, Xavier did not tell

4

Maia her address. Maia said he would call the police if she did not give him her address; she told him not to call the police and screamed at him to take her home. Eventually, Maia brought Xavier to the home of his girlfriend, Katie Nicoletti, an operating room nurse.

Nicoletti tried to help by offering to call a ride and to provide dry clothes. Xavier did not coherently answer questions and snapped when Nicoletti offered assistance. Nicoletti believed Xavier either had a psychologic issue or was on drugs, but saw no sign of a head injury.

Nicoletti called the police. According to Nicoletti, Xavier's reaction to the police arriving was "alarming" making Nicoletti think "there's something more to the story." Xavier lied to the police about how Maia picked her up. During the interaction Maia and Nicoletti had with Xavier, she did not mention a car crash or a passenger in the car who might need assistance.

Police officer Andrew Thorpe and his partner responded to Nicoletti's call for service at about 9:40 p.m. During the encounter, Xavier was initially pleasant and "seemed like she knew mostly where she was, what she was doing" despite being tipsy. She was able to stand up on her own. She told the officers she had three drinks that night and had gotten into a fight with Waller. She was crying and stated that she was emotional. Xavier also explained she had a cut on her lip from falling or biting it but told the officers she did not need a medic.

The officers offered Xavier a courtesy transport home. During the ride, she began continuously throwing up with the odor of alcohol, and Officer Thorpe realized she was extremely intoxicated, more so than he initially thought and more than she told him. Officer Thorpe commented that Xavier could go to jail for her behavior, meaning for being drunk in public and

5

unable to care for herself under Penal Code[3] section 647, subdivision (f). In his opinion, she was definitely too intoxicated to drive a vehicle. He did not notice any signs of a head injury. At no point did Xavier inform the officers that she had been driving, crashed her car, or left her passenger.

At 10:04 p.m., the officers returned Xavier to her apartment complex. Xavier returned to her apartment at 10:31 p.m., leaning left as she walked and holding her shoes, leaving wet footprints along the way.

The next day, Xavier told her friend Athena N. she was looking for Waller. Xavier explained she and Waller had gone out in Pacific Beach and drank a lot the night before. Xavier said "she blacked out and . . . stopped remembering things," which Athena N. understood to have occurred due to excess drinking. Xavier stated "the last memory she had was leaving Sidnie in Pacific Beach," and she had "splotchy memories of . . . a ditch and flagging someone down on the road." Athena N. did not recall any signs that Xavier had suffered a head injury and understood that her lack of recollection was related to drinking.

The day after the incident, Xavier also sent messages over social media to another friend. When asked what happened, Xavier wrote, "We just got really drunk I got in trouble with the cops and then went over to sidnies this morning cause I couldn't remember how she got home."

On March 8, 2021, Xavier met with California Highway Patrol investigators. She had a cut inside her lip but did not have any other visible head injuries. She had a red mark on her left shoulder consistent with a driver's side seatbelt, and some other minor abrasions.

Based on the events of March 4, 2021, the prosecution charged Xavier with: (1) second degree murder (§ 187, subd. (a) [count 1]); (2) gross vehicular

---

[3]     Undesignated statutory references are to the Penal Code.

manslaughter while intoxicated (§ 191.5, subd. (a) [count 2]); (3) driving under the influence of alcohol and/or drugs causing injury (Veh. Code, § 23153, subd. (g) [count 3]); and (4) fleeing the scene of an accident that resulted in death (Veh. Code, § 20001, subd. (b)(2) [count 4]).  The amended information also made special allegations as to counts 2, 3, and 4.

At trial, in addition to evidence of the events of March 4, 2021, the prosecution introduced prior communications from Xavier.  About two weeks before the fatal incident, Xavier discussed going out in Pacific Beach with her friend Tatiana S.  Xavier wrote, "I might Uber us. I feel like driving with a car full scares me from PB," and later, "I just am stupid for last time I drove home. So I'd rather be safe."  On November 28, 2019, Xavier and Tatiana S. discussed an incident in which Xavier drank, drove, and was involved in a vehicle collision.  As is relevant, the text message exchange was as follows:

"[Tatiana S.:]  You cannot keep driving drunk.
"[¶] . . . [¶]
"[Xavier:]       I know. I fucked up.
"[¶] . . . [¶]
"[Xavier:]       I don't know man. I sobered up after like three hours and was like what the fuck did I do. Such a terrible feeling. At least it's over.
"[¶] . . . [¶]
"[Xavier:]       I know. It's just like I fucked. I really really fucked up. I just need to chill and like have someone hide my keys.
"[Tatiana S.:]  From now on, not even buzzed driving. It's canceled because this shit is more serious than we think.
"[¶] . . . [¶]
"[Xavier:]       Exactly. And yes please.
"[¶] . . . [¶]
"[Tatiana S.:]  Everything happens for a reason. Like who knows. Maybe in a month or something, if this didn't happen, and you kept drinking

7

> and driving, you could have got pulled over and got an actual DUI or hurt someone.
>
> "[Xavier:]        [Loved message]
> "[¶] . . . [¶]
> "[Tatiana S.:]    Like it's shady now, but this version is a lot better than if cops were involved.
> "[Xavier:]        I really hope so. And honestly just thinking about it. And I feel like I could have killed myself. Like what if the reason I crashed was because if I would have gotten on the freeway, I could have literally killed someone or myself
> "[¶] . . . [¶]
> "[Tatiana S.:]    The freeway. Jesus. Thank God you never got on that. That shits crazy especially late at night. People fly through that shit. It definitely happened for a reason.
> "[¶] . . . [¶]
> "[Xavier:]        I'm glad too.
> "[¶] . . . [¶]
> "[Xavier:]        Like that could have been re[ally] bad. I don't even want to think about it anymore. I'm never getting in the car after drinking again. Like never again.

The prosecution called a law enforcement investigator who was both experienced in traffic safety and a certified drug recognition expert. He opined that Xavier was "extremely impaired" based on her appearance in Officer Thorpe's body-worn camera, witness statements, and the circumstances of the crash. Based on his investigation and experience, a California Highway Patrol (CHP) investigator opined, "Jennifer Xavier caused this collision by driving under the combined influence of alcohol and a depressant."

A defense expert, who had not examined Xavier or viewed her medical records, opined that concussions are very common in high-velocity rollover accidents, the symptoms of an individual with a concussion can appear

8

similar to those of an individual under the influence of alcohol and other central nervous system depressants, and diagnosis of a concussion requires a medical examination of the patient, as opposed to watching a video of the individual. The expert stated that an injury to the brain takes two to three weeks to fully heal, with the "peak of symptoms . . . usually at three to five days, so not immediately all there at once." He acknowledged that he could not determine whether Xavier suffered from a concussion, but opined that the circumstances indicated, more likely than not, she experienced a traumatic brain injury, with alcohol possibly playing a part. He would expect an individual with alcohol induced amnesia to have heavily slurred speech and to be walking unsteadily.

Following the presentation of evidence, the court instructed the jury using the version of CALCRIM No. 520 on implied malice then in effect, stating:

> "The defendant had *implied malice* if:
>
> > "1. She intentionally committed the act;
> > "2. The natural and probable consequences of the act were dangerous to human life;
> > "3. At the time she acted, she knew [her] act was dangerous to human life;
> > "AND
> > "4. She deliberately acted with conscious disregard for human life."

The jury convicted Xavier on counts 1, 2, and 4 and found all related allegations true. However, the jury did not reach a verdict as to count 3. The trial court declared a mistrial as to count 3 and granted the prosecution's motion to dismiss that count.

The court sentenced Xavier to 19 years to life in state prison consisting of 15 years to life for count 1, second degree murder, plus a consecutive four

years for count 4, fleeing the scene of an accident that resulted in death. The court stayed the punishment on count 2 under section 654.

DISCUSSION

We begin by addressing whether the trial court abused its discretion by admitting Waller's message to her brother that Xavier drank a lot and consumed Xanax. Next, we consider whether the trial court properly instructed the jury on the elements of implied malice. We then examine Xavier's argument that insufficient evidence existed for the jury to convict her of implied malice murder and fleeing the scene of an accident. Finally, we analyze each instance of claimed prosecutorial misconduct. We conclude no prejudicial error occurred, and thus there was no cumulative error.

I.

*Admission of Text Messages as Spontaneous Statements*

Xavier contends the trial court erred by admitting Waller's text message to her brother, "Jenny drank so much and took a bar" because: (1) the prosecution failed to establish a foundation that the text message was made at the time of stress, and (2) the text did not involve the stressful event but described an event that had occurred earlier in the evening.

Hearsay evidence, or "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated," is inadmissible unless the law provides an exception. (Evid. Code, § 1200, subds. (a) & (b).) One such exception exists for "spontaneous statements" that: "(a) Purport[ ] to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) W[ere] made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.)

For hearsay to be admissible under the spontaneous statement exception, " ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.] Spontaneous statements are deemed sufficiently trustworthy to be admitted into evidence because ' " 'in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.' " [Citation.]' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809–810 (*Gutierrez*).)  "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*Id.* at p. 811.)  "[T]he larger picture of the prosecution's evidence, and the reasonable inferences to be drawn from it" are relevant to the speaker's mental state. (*People v. Rincon* (2005) 129 Cal.App.4th 738, 752.)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*People v. Merriman* (2014) 60 Cal.4th 1, 65.)  "[W]e will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that

11

resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

A. *Foundation as to Timing of Messages*

Prior to trial, the defense sought to exclude a portion of Waller's messages to her brother for lack of foundation because they did not have timestamps. The trial court concluded that the message exchange was admissible, including the statement, "Jenny drank so much and took a bar." The court later confirmed the admissibility of that message, stating, "Well, and I'm looking at the context of the texts, and even though it's not time-stamped, the context is pretty clear that this is— this is after they've left the bar and now they're driving," like the other messages sent by Waller with time stamps.

On appeal, Xavier again contends the context of the statement, "Jenny drank so much and took a bar," was not clear because Waller had previously texted "Oh hahahaha" and because her brother suggested she drive instead or take an Uber. According to Xavier, then, the message may have occurred prior to the stressful event creating nervous excitement, which Xavier agrees was the dangerous driving.

Xavier has not demonstrated an abuse of discretion. Contrary to her suggestion, the context of the "Jenny drank so much and took a bar" message is sufficiently clear despite the lack of timestamps. Waller sent four text messages between "Oh hahahaha" and "Jenny drank so much and took a bar": "I'm so scared," "[Brother], I might get into an accident," "Pray for me," and "I'm fucking terrified." Given this direct evidence of Waller's fearful mental state, no timestamp correlating with Xavier's driving was necessary for the trial court to reasonably find sufficient foundation that Waller was in a state of nervous excitement when she wrote, "Jenny drank so much and

12

took a bar." Likewise, Waller's messages thereafter, including "I'm gonna be sick holy shit this is so scary," "She's swerving all over," and "Almost ran into five cars," demonstrate the stressful event had not yet ended.

Further, as noted by the trial court, Waller's messages to her brother prior to the Xanax message were similar in content to the timestamped messages to Mendez that occurred minutes before the crash. In both sets of messages, Waller expressed fear, requested that the recipient pray for her safety, and commented on Xavier's state.

B. *Relationship of the Statement to the Stressful Event*

Xavier next asserts Waller's statement that Xavier consumed "a bar" of Xanax was inadmissible under the spontaneous statement hearsay exception because it was unrelated to the erratic driving that caused nervous excitement. According to Xavier, any act of taking a Xanax would have occurred earlier in the day with time for reflection by Waller.

When considered with the prior text messages, "I'm so scared," "Jacob, I might get into an accident," "Pray for me," and "I'm fucking terrified," the trial court reasonably understood that Waller was doing more than simply describing Xavier's earlier actions drinking alcohol and taking Xanax. The trial court reasonably determined that Waller was "terrified" not by Xavier's act of drinking and taking Xanax, but rather by her act of driving Waller after having done so. In other words, Waller was describing her present impression that Xavier was currently driving dangerously while impaired by the effects of alcohol and Xanax.

The cases cited by Xavier do not persuade us that the trial court abused its discretion by admitting the text message at issue.

In *People v. Corella* (2004) 122 Cal.App.4th 461 (*Corella*), the trial court admitted the appellant's wife's statements to a 911 operator and to police

13

that (1) the appellant had hit her after she hid his car keys because he had drunk alcohol, and (2) she also had told him not to smoke marijuana because it would violate his probation. (*Id.* at p. 465.) The Second District concluded the first statement was admissible and the second was inadmissible under Evidence Code section 1240:

> "Mrs. Corella's statements that she hid the car keys to prevent Corella from leaving their home in an intoxicated condition were a description of the event that culminated in Corella's violent act and were closely connected with the occurrence at issue. The statements were also an unreflective explanation of her perception of the reasons why Corella hit her. There was no abuse of discretion in admitting the evidence under section 1240. [Citation.]

> "Mrs. Corella's statements that Corella was smoking marijuana and was on probation, however, did not "narrate, describe, or explain" the commission of the offense or any relevant circumstance under which the offense was committed." (*Corella, supra*, 122 Cal.App.4th at p. 466.)

Like the first statement in *Corella*, the statement that Xavier had consumed alcohol and Xanax was "closely connected with the occurrence at issue" and "an unreflective explanation of [Waller's] perception of the reasons why" Xavier was driving dangerously, resulting in Waller's terror. (*Corella, supra*, 122 Cal.App.4th at p. 466.) Consuming alcohol and Xanax is plainly relevant to the act of driving under the influence.

*Gutierrez, supra*, 45 Cal.4th 789, *People v. Lozano* (2024) 101 Cal.App.5th 366, 379 (*Lozano*), and *People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1526 (*Ramirez*) each addressed whether the passage of time allowed for reflection by the speaker such that he or she was no longer in an excited state from the startling event. Unlike those cases, Xavier's case does not involve the question whether the speaker remained under the stress of excitement after the passage of time. There is no dispute whether Waller had time to

14

deliberate after the startling event, as that event eventually rendered her unconscious. The questions are whether Waller's statements occurred *prior to* the startling event and whether the content of the message stating "Jenny drank so much and took a bar" related to the startling circumstance. As discussed above, the trial court reasonably determined, by a preponderance of evidence, that the text message exchange beginning with "I'm so scared" to "She's swerving all over . . . Almost ran into five cars" occurred while Waller was under the stress of excitement during Xavier's reckless driving under the influence. Nor did the court abuse its discretion by finding that Waller's statements, including her perception of Xavier's intoxicated state, related to the reckless driving causing Waller's fear.

## II.

### *Implied Malice Murder Instruction*

Xavier contends her murder conviction must be reversed because the version of CALCRIM No. 520 given, since modified following *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*),[4] lowered the burden on the prosecution by merely requiring an act that was dangerous to human life, as opposed to an act that carries a high probability of death. According to Xavier, *Reyes* settled courts' prior "confusion" between the "dangerous to human life" language and "high probability" of death required to establish implied malice. She asserts the error in using the "dangerous to human life" language

---

[4] Since Xavier's trial, CALCRIM No. 520 has been modified to state in relevant part: "The natural and probable consequences of the (act/[or] failure to act) were dangerous to human life *in that the (act/[or] failure to act) involved a high degree of probability that it would result in death*." (Italics added.) In making this modification, however, the CALCRIM committee did not suggest that it was legal error to give the prior version, the substance of which was approved in *People v. Nieto* Benitez (1992) 4 Cal.4th 91, 103–104, 110–111 (*Nieto Benitez*) and *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219, 1221–1222 (*Dellinger*).

amounted to federal and state constitutional error by lowering the prosecution's burden below the beyond a reasonable doubt standard and was preserved without the need for objection.

The Attorney General first contends that Xavier has forfeited this contention by failing to request any such clarifying instruction at trial. The People next assert the instruction given properly states the law even after *Reyes* because cases have established that "dangerous to human life" is synonymous with a "high probability of death."

As described in Xavier's opening brief, courts historically used two different formulations for the definition of implied malice: (1) " 'an act, the natural consequences of which are dangerous to human life,' " (quoting *People v. Phillips* (1966) 64 Cal.2d 574, 587 (*Phillips*)) and (2) " ' "an act [committed] with a high probability that it will result in death" ' " (quoting *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*)). (*Nieto Benitez, supra*, 4 Cal.4th at pp. 103–104, 110–111.) Our Supreme Court has repeatedly explained, however, "that the two linguistic formulations . . . are equivalent and are intended to embody the same standard." (*Id.* at p. 111; see also *Dellinger, supra*, 49 Cal.3d at pp. 1219, 1221–1222 [approving CALJIC definition of implied malice without any "high probability" language and noting that *Watson* "made it abundantly clear that the two definitions of implied malice" in the case law "articulated one and the same standard"].)

In *Nieto Benitez*, the defendant argued, similarly to Xavier, that CALJIC No. 8.31 "misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that

death will result."[5] (*Nieto Benitez, supra*, 4 Cal.4th at pp. 110–111.) The Supreme Court disagreed and concluded that "the present CALJIC No. 8.31 correctly distills the applicable case law." (*Ibid.*) Later, in *People v. Knoller* (2007) 41 Cal.4th 139, 157 (*Knoller*), the Supreme Court stated that, to the extent the implied malice tests differ, courts should properly instruct the jury using the language from *Phillips*.[6] Xavier does not dispute that her arguments on appeal run contrary to both *Nieto Benitez* and *Knoller*.

We disagree with Xavier that these cases have been impliedly overruled by the Supreme Court's decision in *Reyes*. There, the court was reviewing a trial court's denial of a petition for resentencing under section 1172.6. (*Reyes, supra*, 14 Cal.5th at p. 984.) The Supreme Court concluded there was insufficient evidence to support a theory that the defendant was guilty of murder as a direct perpetrator who harbored implied malice. (*Id.* at pp. 988–990.) The court based its decision primarily on the lack of substantial evidence of proximate cause, but it also took issue with the trial court's conclusion that the defendant's conduct was " 'dangerous to human life.' " (*Ibid.*) The Supreme Court explained: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' " 'involve[ ] a high degree of probability

<hr />

[5]    The version of CALJIC No. 8.31 given in *Nieto Benitez* stated in relevant part: " 'Murder of the second degree is [also] the unlawful killing of a human being when:  [¶]  1. The killing resulted from an intentional act, [¶] 2. The natural consequences of the act are dangerous to human life, and [¶] 3. The act was deliberately performed with knowledge of the danger to, and conscious disregard for, human life.' " (*Nieto Benitez, supra*, 4 Cal.4th at p. 100.)

[6]    The *Knoller* court discussed the "high probability" language because the trial court relied on the *Thomas* language when ruling on the defendant's motion for new trial. (*Knoller, supra*, 41 Cal.4th at p. 157.)

that it will result in death.' " ' " (*Id*. at p. 989, quoting *Knoller*, *supra*, 41 Cal.4th at p. 152.) The court concluded that the defendant's conduct in traveling to rival gang territory with other gang members did "not by itself give rise to a high degree of probability that death will result." (*Reyes*, at p. 989.)

*Reyes* did not involve a jury instruction issue, and the court did not suggest that either *Nieto Benitez* or *Knoller* was wrongly decided. The *Reyes* court's reference to the "high probability of death" standard in deciding a sufficiency of evidence question under section 1172.6 does not amount to a holding that trial courts must include such language in the jury instructions defining implied malice. *Reyes* did not call into question prior holdings that the "high probability" and "natural consequences" standards of implied malice are one and the same, and that it is proper to instruct the jury solely on the latter. (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 111; *Dellinger*, *supra*, 49 Cal.3d at pp. 1219, 1221–1222.) To the contrary, *Reyes* quoted with approval language from *Knoller* reaffirming that "under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death." ' " (*Reyes, supra*, 14 Cal.5th at p. 989, citing *Knoller, supra*, 41 Cal.4th at p. 152.) Because *Reyes* did not decide this instructional issue and did not overrule or disapprove any of its own prior case law, we remain bound by its decisions in *Nieto Benitez* and *Knoller*. We therefore find no error in the implied malice instruction given at Xavier's trial.

18

III.

*Sufficiency of the Evidence*

Xavier contends insufficient evidence existed to support her convictions for implied malice murder and fleeing the scene of an accident that resulted in death.

When reviewing a claim of insufficient evidence, " 'the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] 'A reviewing court neither reweighs the evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378.)

A. *Implied Malice Murder*

Xavier argues: (1) objectively, there is not a high probably that drunk driving will result in death, and (2) subjectively, there is not sufficient evidence that Xavier had conscious disregard to human life because she had not previously suffered a drunk driving conviction and her earlier text messages did not suffice as knowledge of the high probability of death.

19

"Murder is the unlawful killing of a human being . . . with malice aforethought."  (§ 187, subd. (a).)  "[M]alice may be express or implied."  (§ 188, subd. (a).)  Implied malice exists "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (§ 188, subd. (a)(2).)  Because of the lack of clarity in the statutory definition of implied malice, the *Phillips* and *Thomas* definitions of implied malice developed.  (*Knoller, supra*, 41 Cal.4th at p. 152.)  In sum, "[t]o support a finding of second degree murder based on implied malice, the evidence must establish that the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of its danger to life and a conscious disregard of that danger."  (*People v. Superior Court* (*Chagolla*) (2024) 102 Cal.App.5th 499, 514 (*Chagolla*).)

It has long been established that "[m]alice may be implied when a person willfully drives under the influence of alcohol."  (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 681, citing *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).)  "Thus, 'killing a person while driving intoxicated is second degree murder if 'a person, knowing that his [or her] conduct endangers the life of another, nonetheless acts deliberately with conscious disregard of life.' "  (*Chagolla, supra*, 102 Cal.App.5th at p. 511.)  This test involves an objective component—an intentional act endangering the life of another—and a subjective component—knowledge and disregard of the danger.  (*People v. Clements* (2022) 75 Cal.App.5th 276, 299.)

1. *Objective High Probability of Death*

By asserting that drunk driving statistically does not involve a "high probability" of causing death, Xavier in essence asks us to conclude that *Watson* murder no longer exists after *Reyes*.  But, just as *Reyes* did not

overrule the cases approving of the prior jury instruction on implied malice murder using the "dangerous to human life" language, the court there did not indicate that malice can no longer be implied in intoxicated driving killings. *Reyes* only concluded that the defendant's act of entering territory of a rival gang with his fellow gang members, one of whom was armed, did not suffice to establish implied malice on the part of the defendant. (*Reyes, supra*, 14 Cal.5th at pp. 989–990.)

Contrary to the implication of Xavier's argument, the concept of an act causing "high probability" of death is not a new one requiring reconsideration of implied malice murder in the drunk driving context. In *Watson*, the court explained that the definition of implied malice, "an act with a high probability that it will result in death and [done] with a base antisocial motive and with a wanton disregard for human life," is merely "[p]hrased in a different way" from the definition " ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " . . . .'." (*Watson, supra*, 30 Cal.3d at p. 300.) Thus, the Supreme Court established the concept of implied malice murder in this context considering the "high probability language." And, as noted above, *Reyes* approved of the equivalence between the variations of implied malice, quoting with approval language from a prior opinion that both definitions "mean[ ] the same thing." (*Reyes, supra*, 14 Cal.5th at p. 989.) Consequently, we remain bound by the *Watson* rule that intentionally driving while intoxicated suffices as the act required for implied malice murder.

2. *Subjective Knowledge*

As for the subjective component of implied malice murder, Xavier contends there was insufficient evidence that she subjectively acted with

conscious disregard for human life. According to Xavier, the prosecution failed to establish "knowledge of the high likelihood that drunk driving will result in death" that "[a] *Watson* murder requires." As explained in *Knoller*, however, it is not required that the defendant have knowledge of *high probability* of death, which is the objective component: "But 'high probability of death' is the *objective*, not the *subjective*, component of the *Thomas* test, which asks whether the defendant's act or conduct 'involves a high probability that it will result in death.' [Citation.] The *subjective* component of the *Thomas* test is whether the defendant acted with 'a base, antisocial motive and with wanton disregard for human life.' [Citation.] Nor does the *Phillips* test require a defendant's awareness that his or her conduct has a *high probability* of causing death. Rather, it requires only that a defendant acted with a 'conscious disregard for human life.'" (*Knoller*, *supra*, 41 Cal.4th at p. 157.)

Here, a rational trier of fact could conclude Xavier acted with conscious disregard for human life because there was direct evidence that she was aware that driving while intoxicated risked killing someone. She disregarded that risk by driving while intoxicated. After admitting to driving drunk before crashing her vehicle in 2019, Xavier stated, "I could have literally killed someone or myself." Then, weeks before the collision in this case, she again acknowledged the dangers of drinking and driving, stating that the "last time" she did so, it was "stupid" and unsafe. Despite that knowledge, she drove while intoxicated, causing the death of Waller. Xavier cites no authority suggesting that *Watson* murder convictions are possible *only* after a prior drunk driving conviction resulting in an educational class on the dangers of drunk driving. Although subjective knowledge *can be* inferred from an educational program (*People v. Wolfe* (2018) 20 Cal.App.5th 673,

22

683), we need not rely on an inference where, as here, direct evidence of Xavier's knowledge of the danger exists.

B. *Leaving the Scene of an Accident*

Xavier also disputes that sufficient evidence exists to support her conviction under Vehicle Code section 20001, subdivision (b)(2). Vehicle Code section 20001, subdivision (a) requires "[t]he driver of a vehicle involved in an accident resulting in injury . . . or in the death of a person [to] immediately stop the vehicle at the scene of the accident" and to "provide identification and render aid to the victim, as well as to report the accident to authorities if there is no police officer present." (*People v. Martinez* (2017) 2 Cal.5th 1093, 1102.) Subdivision (b) of that section makes such fleeing the scene of an accident a criminal offense, with subdivision (b)(2) providing the punishment in the case of death or serious injury. (*People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1236–1237 (*Nordberg*).) This offense is a general intent crime. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1019.) It requires the offender to have knowledge of injury, which is " '[u]sually . . . derived from the surrounding facts and circumstances of the accident' " because " 'the driver who leaves the scene of the accident seldom possesses actual knowledge of injury.' " (*Nordberg*, at p. 1237.) Thus knowledge of the injury can be actual or based on " 'the accident [being] of such a nature that one would reasonably anticipate that it resulted in injury to a person.' " (*Ibid.*)

Xavier claims the evidence does not support the requisite intent for this conviction because she was "dazed and incoherent" and appeared to be "in a state of shock" after the crash. But viewing the evidence most favorably to the prosecution, a rational jury could conclude that Xavier knew that overturning her vehicle in a creek would likely result in injury to a passenger and that she intended to leave the scene. Xavier managed to climb out of the

23

overturned vehicle in the creek and return to the main road. She then flagged down assistance for herself, asking Maia to take her home. We agree with the Attorney General that the jury could reasonably infer knowledge of likelihood of injury and intent to leave the scene from Xavier's ability to escape and obtain assistance. Further, the jury viewed the video of police officers speaking to Xavier shortly thereafter, during which she was standing and appeared coherent, telling the officers where she lived. Officer Thorpe and Nicoletti also testified Xavier was able to stand and respond to the police officers. She explained that she was emotional, which was consistent with being aware of a crash destroying her vehicle.

We conclude sufficient evidence supports Xavier's conviction under Vehicle Code section 20001.

## IV.

### *Prosecutorial Misconduct*

Finally, Xavier asserts several instances of prosecutorial misconduct throughout the trial.

"Under state law, ' "[a] prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct . . . ." ' [Citation.] Prosecutorial misconduct violates the federal Constitution when it results in a fundamentally unfair trial. [Citation.]" (*People v. Steskal* (2021) 11 Cal.5th 332, 350 (*Steskal*).) "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).) " 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible,

prevent by suitable instructions the harmful effect upon the minds of the jury." ' " (*Id.* at p. 1341.)

"As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)  In addition, "reversal for prosecutorial misconduct requires prejudice manifested by a reasonable possibility of an effect on the outcome." (*People v. Williams* (2010) 49 Cal.4th 405, 467.)  "[R]eversal under the federal Constitution also requires prejudice, although prejudice 'is presumed unless the government shows that the defect was harmless beyond a reasonable doubt.' " (*Id.* at p. 467.)

A.  *Athena N.'s Reference to Xavier Blacking Out*

Xavier first contends the prosecutor committed misconduct by questioning Athena N. about Xavier blacking out, asserting that the trial court had excluded the use of that term.  We conclude the prosecutor's conduct was not in violation of the court's in limine order, and, regardless, the curative instruction given by the court rendered any misconduct harmless.

1.  *Additional Relevant Facts*

This motion was in reference to Xavier's text message, "I might Uber us. I feel like driving with a car full scares me from Pb," and later, "And idk I just am stupid for last time I drove home [redaction] so I'd rather be safe." Prior to trial, defense counsel orally brought "a motion in limine . . . that we preclude the prosecution's use of the word 'blacked out' unless there's evidence that she blacked out."   Defense counsel later explained, "All I'm asking is the part 'I don't remember' be removed. It still gets the prosecution to where they need to be, and it's not overly prejudicial to the defendant at that point by creating insinuations of a blackout that don't exist."  The court

25

ruled: "Okay. All right. And so I'll sanitize it so that 'I don't remember' is excluded."

At trial, the prosecution's relevant questioning of Athena N. went as follows:

> "Q. And what did she tell you they did when they went back to the bar?
> "A. And continued to drink, and that's where she said that she blacked out and started—like, stopped remembering things.
> "Q. What does the term 'blacked out' mean to you?
> "A. Stop remembering things, drink to an excess to where There's just spots in your memory or completely just nothing in your memory.
> "Q. Was there anything shocking about this when she told you that?
> "A. Not necessarily.
> "Q. What did she tell you happened after the two girls went back to Open Bar and continued to drink?
> "A. She said that's where her memory really started to go away, and the last memory she had was leaving Sidnie in Pacific Beach.
> "Q. Did she tell you anything else that she remembered about that night?
> "A. Later on, she had, like, splotchy memories of, like, a ditch and flagging someone down on the road. Yeah. But other than that, no.
> "Q. Did she tell you that she drove home blacked out?
> "A. Yes."

Defense counsel did not object. Instead, defense counsel proceeded to question Athena N., extensively about Xavier blacking out:

> "Q. Now, in your conversations with Jenny that day -- with Ms. Xavier, she told you that she had blacked out; correct?
> "A. Yes.
> [¶] . . . [¶]
> "Q.—the term "blacked out" —that, in your

vernacular, means that's somebody who's really, really drunk?

"A. Correct.

"Q. Have you seen other people that you would call "blackout drunk"?

"A. Yes.

"Q. And how—how would they—how would you describe what they would look like to you, or to any of us, as someone who is blackout drunk?

"A. Extremely incoherent.

"Q. How about their ability to stand up, for example?

"A. Yeah. Barely.

"Q. How about their ability to walk a straight line?

"A. Definitely not.

"Q. How about their speech? Would you be able to hear them—

"A. Slurring, yeah.

"Q. And, again, that's not just somebody who's had a few drinks.

That's somebody who's extremely intoxicated; true?

"A. Yes.

"Q. To be the point where they're blacked out; right?

"A. Yeah.

"Q. And she then said she had a vague memory of sitting on a curb, talking to some cops before walking to her car and driving home blacked out; correct?

"A. Yes.

"[¶] . . . [¶]

"Q. And this is shortly after she's told you that she doesn't remember how she got home; correct?

"A. Yeah."

On redirect, the prosecution questioned Athena N. about her prior experiences of Xavier blacked out from drinking, establishing that Xavier would not necessarily be "falling-down drunk." And on recross, the defense followed up on the distinction between being "really drunk" and "blackout drunk," and whether Athena N. had "seen [Xavier], quote, blackout drunk to

27

the point where she was unable to recall anything from the night before." Athena N. could not confirm for sure.

The next morning, defense counsel moved for a mistrial due to the prosecutor questioning Athena N. about Xavier blacking out, stating the court made "a prior ruling on May 9th that we were not to use that term in this trial absent the door being opened by the defense and their experts prior to the introduction of any such evidence." Defense counsel explained that he declined to object due to "jury optics" so as to not appear as "trying to hide the ball" or "trying to stifle a witness." The court permitted briefing at the prosecution's request and determined that a curative instruction to the jury not to consider Xavier's past drinking habits or past "blackouts" would remedy the issue. As to Xavier's statements to Athena N. that she was blacked out on the night of the collision, the court specified that the motion in limine ruling and limiting instruction did not apply. Thus, the court instructed the jury, "Regarding yesterday's last witness Athena N[.], you are to disregard any and all testimony of this witness as it relates to any past conduct of Jennifer Xavier occurring prior to March 4th, 2021, as inadmissible evidence."

2. *Analysis*

We conclude the prosecutor's questioning was not misconduct because it did not violate the trial court's order. While "[i]t is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order" (*People v. Crew* (2003) 31 Cal.4th 822, 839), the prosecutor did not do so here. The trial court did not entirely preclude the use of the term "black out" as implied in the appellant's opening brief. When making the motion, the defense first requested that the term blackout be excluded *unless there was evidence that Xavier blacked out*

28

and later clarified that he was asking that the specific text message be sanitized to remove the "I don't remember" to avoid follow up questions on whether Xavier blacked out in that instance. The trial court ruled that the text message would be so sanitized, not that any use of the term "black out" would be excluded when raised by a witness.

Furthermore, any misconduct was harmless because the trial court gave a curative instruction to the jury when the defense finally objected. We presume the jury followed the curative instruction. (*People v. Horn* (2021) 63 Cal.App.5th 672, 686.) Additionally, the trial court made clear that its ruling and instruction applied only to evidence of prior instances, not to Xavier telling Athena N. that she blacked out on the night of the collision. Any testimony of prior blackouts was inconsequential compared to the properly admitted testimony by Athena N. that Xavier stated she was blacked out on the night the collision occurred. Because there was no prejudicial misconduct, the trial court did not abuse its discretion by relying on the curative instruction for the past blackouts rather than declaring a mistrial.

B. *Tatiana S.'s Reference to Counsel*

Xavier next contends the prosecutor committed misconduct by asking a witness if and when she sent Xavier an attorney's contact information, and the trial court erred by declining to give a curative instruction.

1. *Relevant Facts*

Prior to trial, the defense moved to exclude mention of the fact that, when she met with CHP on March 8, Xavier brought a lawyer, who had also set up the meeting with CHP. While the court did not explicitly rule on the motion, the court stated: "Well, why don't we just say—I mean the way to say it is that she was contacted by CHP, and . . . she voluntarily agreed to

meet with them on some day. And she met with them, and they just—they took photos and fingerprints and boom, and that's it."

At trial, the prosecution asked Xavier's friend and roommate Tatiana S., "You also on your own ended up sending her a lawyer's number; correct?" Tatiana S. responded in the affirmative, stating that she did so on March 6. The defense did not object at this point.

Later, on redirect examination, the prosecutor questioned Tatiana S. as follows:

> "Q[.] When was it that you talked to Officer Clinkscales?
> "A[.] March 8, 2021.
> "Q[.] Two days after you had already sent the lawyer's number to Jennifer Xavier?
> "[Defense counsel]: Your Honor, this is improper questioning."

The court sustained the objection and struck the question. The defense later requested a curative instruction, and the court declined.

2. *Analysis*

We conclude the initial question whether Tatiana S. sent an attorney's number did not violate the court's in limine ruling, which related to the attorney setting up and attending the meeting with CHP. Nor did defense counsel object. As to the latter question, the trial court sustained the defense's objection before any testimony associating the attorney with the CHP meeting. Therefore, no prejudicial conduct occurred, and the court properly declined to give a curative instruction to the brief questioning stopped quickly by the trial court. (See *Steskal, supra*, 11 Cal.5th at p. 353 [alleged prosecutorial misconduct based on prosecutor's comment to the jury about failure to call logical witnesses was harmless because "the comment was brief, 'defendant's objection was immediately sustained . . . and the prosecutor did not return to the subject' "].)

30

C. *Daniel K.'s Belief the Driver Was Under the Influence*

Next, Xavier contends the prosecutor engaged in misconduct by eliciting testimony from a witness that Xavier appeared to be driving under the influence based the vehicle's movements. We conclude the prosecutor's questioning did not violate the trial court's ruling.

1. *Relevant Facts*

The defense brought a motion in limine to exclude opinions by lay witnesses regarding whether Xavier was intoxicated. The court ruled that lay witnesses were permitted to testify as to what they observed and whether "she appeared to be drunk, based on [their] experience."

At trial, the prosecution questioned Daniel K., a driver who witnessed Xavier's car veer off the road, as follows:

> "Q. We talked about the speed estimation, and you're not an expert.
> As an estimate, what makes you say—you know, can you describe how this car was traveling, without using a number? What was your takeaway and your perception as you saw this car?
> "A. What—what kind of takeaway? Like, the speed? Describe the style of driving or—
> "Q. Yes, please. The style of driving.
> "A. Erratic. I just—right away, like, drunk driver or, you know—

And later, the prosecutor asked Daniel K.:

> "Q. At this point, to clarify defense's questions, when we're saying 'no logical reason,' do you account for a person being impaired?
> "MR. CASEY: Foundation, Your Honor.
> "THE COURT: Well, he's already said that it looked like a person was drunk. So—
> "MR. CASEY: I think we need foundation.
> "THE COURT: Well—okay. Well, I think that's an opinion he can—I think it's an opinion he can offer based on his observations.

31

And so go ahead.
"[¶] . . . [¶]Q. When you say there's no logical reason that a driver would do that, does that account for a drunk driver doing that?
A. I could rephrase that. No one in their right state of mind would decide, unless they were suicidal or something, to turn like that off the freeway.
Q. And when you say 'right state of mind,' does that mean 'sober'?
A. Yeah. Like, a sober driver that's not under the influence of anything.

2. *Analysis*

We conclude the trial court did not abuse its discretion by permitting the prosecutor's questioning of Daniel K. Daniel K. testified as to his observations of Xavier's erratic driving and his opinion based on those observations that someone in the "right state of mind," meaning not under the influence of something or suicidal, would not drive that way. This testimony was specifically permitted under the trial court's ruling, including whether the driver appeared drunk based on the witness's observations and experience.

Xavier admits any misconduct was not prejudicial on its own, but only as part of "the prosecutor's pattern of misconduct." We agree that no prejudice would result even if the prosecutor's questioning of Daniel K. amounted to misconduct. The record is replete with evidence that Xavier was driving while intoxicated at the time of the crash, including Waller's messages immediately before the collision, testimony that Xavier was drinking at a bar before driving home, testimony that Xavier's vomit after the collision smelled strongly of alcohol, and Xavier's admission the following day that she got "really drunk" the night before. Nor do we see any pattern of misconduct.

32

D. *Police Investigator Clinkscales' Statement Regarding Tatiana S.*

Xavier next asserts that the prosecutor's questioning of an investigator regarding inconsistent statements of another witness was misconduct.

1. *Relevant Facts*

The defense also moved prior to trial to exclude peace officers' opinions on the veracity of witnesses. Counsel clarified that he referred to opinions that the officer interviewed a witness and found him to be either credible or not believable. The court granted the motion.

At trial, the prosecutor engaged in the following conversation with a police investigator, Officer Clinkscales:

> "Q. And did you also have an opportunity to review other text messages between Tatiana S[.] and Jennifer Xavier?
> "A. Yes.
> "Q. Without getting into her statements, can you tell me how Tatiana S[.] behaved in that interview of her?
> "A. Yes. I spoke with her over the phone, and she provided a lot of information, but there was also a lot of information that wasn't entirely truthful or had pieces that were missing.
> "Q. How was it that you were able to determine that the information she was providing you wasn't truthful?
> "A. They were contradicted in text message conversations."

Later, the prosecutor asked, "Were there things in that portion of the conversation with Tatiana S[.] that were in direct contradiction to the things she told you during her phone interview?" Officer Clinkscales responded affirmatively.

2. *Analysis*

We conclude the prosecutor's questioning of Officer Clinkscales did not violate the court's in limine ruling. The prosecutor's questioning elicited testimony that the information the investigator received from Tatiana S.'s

33

interview was less than or different from the information in her text messages that he reviewed. We agree with the Attorney General that Officer Clinkscales was permitted to comment on the evidence he received. The prosecutor did not ask for, nor did the investigator provide, an opinion on whether Tatiana S. was generally credible or not, as was excluded by the in limine order.

To the extent that the testimony may have been problematic for other evidentiary reasons, the defense did not object to the testimony and thus forfeited any further arguments.

Finally, Xavier does not point to any prejudice from this brief questioning, such as testimony that Tatiana S. provided that, if believed, might have changed the jury's conclusion. And the jury viewed the actual text messages between Tatiana S. and Xavier regarding her prior drunk driving experiences. Again, Xavier admits that no prejudice flowed from this questioning but claims it was part of the "pattern of misconduct," which we conclude does not exist.

E. *Misrepresentation of Law at Sidebar and Questioning of Defense Expert*

Xavier also contends the prosecutor committed misconduct by misrepresenting Evidence Code section 721, subdivision (b)(3),[7] at a sidebar

---

[7] Evidence Code section 721, subdivision (b) provides:
> If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs:
>> (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion.
>> (2) The publication has been admitted in evidence.

so that the court would permit her to question the defense expert on two articles provided by the prosecution during cross-examination.

    1. *Relevant Facts*

    During cross examination, the prosecutor stated on the record that she was providing defense counsel and the expert a copy of two articles.  When presenting these articles, the prosecutor stated, "I'm not going to ask what your opinion is on the articles. I'm just going to use it for guidance in my understanding."  The prosecutor proceeded to question the expert on the concept of alcohol-induced memory loss or amnesia without referencing the articles.  During the questioning about amnesia, the expert raised the article, leading to the following exchange with the prosecutor:

> "A. I think you're referring to this article here now.
> "Q. Is that—are you familiar with the terms?
> "A. I am. I'm just asking if you're reading from the article. It—it—you can have different types. There can be fragmentary amnesia.
> "Q. And have you ever seen this article before?
> "A. No, I have not. And I don't know if you want to talk about the article, if we can or not, but I could have several comments about it, if you'd like.
> "Q. I'm using the article because I don't know all of these medical terms. So I'm going to use this as sort of a guideline about what we talk about with alcohol-induced amnesia.
> "A. The thing that I want to point out about this article, to be fair, is that this is not a research article. This is a compendium of other research articles. There was no direct research done by these people that published this.
> Secondly, it was not published in the—by Health and Human Services. That's who gave access to it. It was

---

> (3) The publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.

published in a journal called 'Alcohol: Clinical and Experimental Research' in 2016.

"Q. I'm going to give you a different article then. You could just tell me what you'd prefer."

After an unreported sidebar, the following exchange occurred:

"THE COURT: All right. Have you had an opportunity to read the article?

"THE WITNESS: I've scanned it, Your Honor.

"THE COURT: Okay. Well, all right.

"THE WITNESS: So, you know, when reviewing literature, there's various important things. One is to first read the article in depth. Secondly is to look at future journal articles that are what we call letters to the editor, which often are critical of the article itself by other experts in the field. And then thirdly is to look at the references.

So you've handed me two articles that I've not seen before. I've scanned them. And with that caveat in mind, I'm ready to answer your questions.

"[The prosecutor]:

"Q. And I'm—again, I'm not going to ask what your opinion is on the articles. I'm just going to use it for guidance in my understanding—"

After some additional questioning on alcohol-induced amnesia by the prosecution, defense counsel moved to strike any cross-examination deriving from the articles as impermissible under Evidence Code section 721, subdivision (b)(3). In response, the court determined the prosecutor "can ask him questions from," meaning "inspired by" the contents of, "the articles but not cite the articles or quote the articles." With agreement by the parties, the court struck the prior cross-examination, instructed the jury to disregard the prior examination, and required the prosecution to start over without providing the articles to the witness or mentioning them.

Xavier also notes that the prosecutor used the term "blackout" multiple times while questioning the defense expert. Each time, the court sustained

36

the defense objection to the term, struck it from the record, and instructed the jury to disregard it.

### 2. *Analysis*

Related to this argument, Xavier moved to augment the record with an unsigned request for a settled statement regarding the sidebar and the transcript from the hearing regarding the request. We grant the motion as to the transcript and deny the motion as to the unsigned settled statement.

Because the sidebar was unreported, it is not clear from the record how the prosecutor represented Evidence Code section 721, subdivision (b)(3), or that she violated that section by using information she learned from the articles to inform her questions. Regardless, the trial court struck the entire cross-examination of the expert after the sidebar and instructed the jury to disregard the prior testimony. We presume the jury followed the instruction. Additionally, nothing in the stricken testimony regarding the articles had the potential to change the outcome of the trial. The expert, in fact, called into question the value of the articles. Xavier contends prejudice existed because the prosecution "used [the articles] to suggest appellant had not suffered a concussion, but rather lost her memory after the accident because of her excessive drinking." However, questioning the expert regarding potential loss of memory due to alcohol consumption, without reference to the articles, was unquestionably permissible, and the prosecutor did so upon re-examination of the expert.

### F. *Photograph of Xavier Drinking*

Finally, Xavier contends that the prosecutor engaged in misconduct by including a photo of her holding a beer with another exhibit.

1. *Relevant Facts*

During the testimony of an officer, the People published as Exhibit 7C Xavier's passport, found inside the vehicle, along with an overlayed photograph showing Xavier, with a friend (not Waller), holding a bottle of beer. Defense counsel did not object to the passport and photograph exhibit when displayed, nor did the prosecution's witness discuss the photograph.

After the conclusion of the officer's testimony and a lunch break, in the middle of another witness' testimony, the defense attorney objected to the photograph that was shown with the passport, noting that it showed Xavier holding a beer. The court agreed that the photograph was inadmissible under Evidence Code section 352 as more prejudicial than probative and determined that an amended copy of the passport would be admitted without the additional photograph.

2. *Analysis*

There is no suggestion in the record that the prosecutor intended to use reprehensible or deceptive methods by showing this photograph, rather than it being inadvertent. Additionally, the defense forfeited any argument related to the brief display of the photograph to the jury by failing to object at the time it was displayed. And as soon as the defense objected, the trial court required the photo be excluded from the exhibit.

Nor did the jury seeing the photo of Xavier drinking a beer at some other time, with someone other than the victim in this case, not while driving, have any possibility of affecting the outcome of the case. In light of the evidence of Xavier drinking and driving on multiple occasions, including on the night of the collision involved here, the jury's brief view of the photo of Xavier holding a beer bottle was inconsequential.

V.

*Cumulative Error*

We have concluded that there was no prejudicial error, and "in the absence of error, there is nothing to cumulate." (*People v. Duff* (2014) 58 Cal.4th 527, 562.)

## DISPOSITION

We affirm the judgment.

McCONNELL, P. J.

WE CONCUR:


IRION, J.


BUCHANAN, J.