Filed 4/20/26  P. v. Bunn CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064656 |
| v. | (Super. Ct. No. INF1701658) |
| SHELLEY ANN BUNN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Jerry C. Yang, Judge. Affirmed as modified.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

Defendant Shelley Ann Bunn crashed her car while driving under the influence of alcohol (DUI). Her passenger died from injuries sustained in the collision. She was convicted of second degree murder under an implied malice theory and sentenced to 15 years to life in prison. On appeal, she primarily argues the trial court's jury instructions misstated the legal standard for implied malice. We disagree. The court's instructions accurately stated the law.

Next, the minute order and abstract of judgment state that the trial court imposed on Bunn (1) a restitution fine (Pen. Code, § 1202.4)[1], which was stayed, and (2) a parole revocation fine (§ 1202.45, subd. (c)), which was suspended. Bunn argues the court struck these fines in its oral pronouncement of judgment, so they must also be stricken from the minute order and abstract of judgment. We find no error.

Finally, Bunn argues she is entitled to three more days of actual custody credits. The Attorney General's office agrees, and so do we. Thus, we modify the judgment to reflect the correct amount of actual custody credits.

The judgment is affirmed as modified.

FACTS AND PROCEDURAL HISTORY

I.

PRIOR DUI CONVICTION

Bunn was arrested in 2007 in Palm Springs and pleaded guilty to DUI. (Veh. Code, § 23152, subd. (b).) Part of her plea deal advised that "if you are to operate a motor vehicle while under the influence of alcohol and you were to crash and kill somebody, you can be charged with murder." Bunn

---

[1] Undesignated statutory references are to the Penal Code.

2

was sentenced to three years of probation and ordered to enroll in a first offender DUI program.

## II.

### THE CURRENT OFFENSE

Around 9:00 p.m., on October 12, 2016, a construction crew was performing an electrical repair at a country club in Rancho Mirage. They parked a truck and an equipment trailer on the main street by the country club. The crew picked this parking location because it was on the biggest street in the area and it "had more than enough clearance between the side of [the] trailer and truck and the center median."

The crew set up orange traffic cones with reflective tape in a tapered formation behind the trailer to move traffic around it and the truck. The cones started about 60 feet back from the trailer, and there was about 15 to 20 feet in between the cones. The crew also erected a road construction sign about 200 to 250 feet ahead of the truck and trailer.

Bunn was driving near the country club at about 12:30 a.m., that night. The victim was seated in the front passenger seat of her vehicle. Bunn had been drinking at a bar earlier that day. During a police interview, she admitted to drinking "[m]ore than I should. I don't know when to quit." Evidence at trial showed that the headlights of Bunn's vehicle were off, and she was driving around 10 miles per hour faster than the posted speed limit of 25 miles per hour.

Bunn drove over some of the reflective cones that the crew had set up and crashed her vehicle into their equipment trailer. Her car caught fire, which the construction crew put out with a fire extinguisher.

One of the crew members called 911, and emergency responders arrived and took Bunn and the victim to the hospital. A police officer who

3

interviewed Bunn at the hospital noticed that her speech was slow and slurred. Based on a blood draw taken at the hospital, her blood-alcohol concentration was between 0.13 and 0.16 percent at the time of the accident.

The victim was unable to stand on his own and complained of severe pain to hospital staff. He later "died of complications from multiple blunt force traumatic injuries he sustained in the collision . . . , including a number of broken bones."

Bunn was arrested at the hospital and was later charged and convicted of second degree murder (§ 187, subd. (a).) The trial court sentenced Bunn to an indeterminate term of 15 years to life in prison.

## DISCUSSION

## I.

### JURY INSTRUCTIONS

#### A. *Legal Background*

"Second degree murder is defined as the unlawful killing of a human being *with malice aforethought*, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102.) "Malice, for the purpose of defining murder, may be express or implied. [Citation.] . . . Implied malice is present 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'" (*Id.* at pp. 102–103.)

"Under certain circumstances, malice may be implied when a defendant kills someone while willfully driving under the influence of alcohol, thus subjecting the defendant to a charge of murder. [Citation.] This is 'colloquially known as a *Watson* murder' after [*People v. Watson* (1981) 30 Cal.3d 290 (*Watson*)]." (*People v. Munoz* (2019) 31 Cal.App.5th 143, 152.)

4

## B. Bunn's Argument

The trial court used CALCRIM No. 520 to instruct the jury on the elements of second degree murder. The court's instructions provided that "[t]he defendant acted with implied malice if: [¶] 1. She intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time she acted, she knew her act was dangerous to human life; [¶] AND [¶] 4. She deliberately acted with conscious disregard for human life."

Bunn contends the above instruction failed to account for a change to the implied malice standard made by the Supreme Court shortly before her trial. Specifically, in *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*), the Supreme Court stated that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[] *a high degree of probability* that it will result in death.""" (Italics added.) Based on *Reyes*, Bunn asserts the trial court's instruction was flawed because it did not require the jury to find that her action—driving under the influence—had a high probability of causing death. We review the alleged error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

## C. The Implied Malice Standard

As we explain below, *Reyes* did not change the implied malice standard. Courts have used two different formulations of this standard for decades. One formulation uses the "natural and probable consequences" wording, which the trial court employed here. The other uses the "high probability" language set forth in *Reyes*. While their wording varies, the Supreme Court has explained multiple times that these two formulations are equivalent. (See, e.g., *People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.)

Thus, we reject Bunn's argument that the trial court's instruction on implied malice misstated the law.

The Fifth Appellate District recently summarized the history of the two different formulations. "Courts have long lamented that '[t]he statutory definition of implied malice . . . is far from clear in its meaning.' [Citation.] In response to this concern, "'[t]wo lines of decisions developed, reflecting judicial attempts 'to translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply.'"" [Citation.] The earlier line of cases originated in Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480 . . . (*Thomas*), and is sometimes referred to as the *Thomas* test or *Thomas* formulation. The later line of cases derives from the high court's opinion in *People v. Phillips* (1966) 64 Cal.2d 574, 587 . . . (*Phillips*), . . . and is sometimes referred to as the *Phillips* test or *Phillips* formulation."[2] (*People v. Pierce* (2025) 114 Cal.App.5th 508, 525.)

"The *Thomas* test provides that malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a *high degree of probability* that it will result in death.' [Citation.] The *Phillips* test provides that malice is implied when the killing is proximately caused by "'an act, *the natural consequences* of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"" (*People v. Pierce, supra,* 114 Cal.App.5th at p. 525, italics added.)

---

[2] A different portion of *Phillips, supra,* 64 Cal.2d 574, was reversed by *People v. Flood* (1998) 18 Cal.4th 470.

"Thus, under the *Thomas* test, the objective act underlying implied malice is described as one which involves 'a high degree of probability that it will result in death.' [Citation.] Meanwhile, the objective act underlying implied malice for the *Phillips* test is described as one with natural consequences 'dangerous to life.' [Citation.] However, in subsequent cases, the high court 'made it abundantly clear that the two definitions of implied malice' in the case law 'articulated one and the same standard.' [Citations.] In line with these holdings, the high court also held that implied malice instructions need not inform the jury that the physical act must involve "'a high probability that [the act] will result in death,'" so long as the instruction informs the jury that the act 'is one "the natural consequences of which are dangerous to life,"' because the two phrases 'are equivalent and are intended to embody the same standard."' (*People v. Pierce, supra*, 114 Cal.App.5th at pp. 525–526.)

For example, in *People v. Nieto Benitez, supra,* 4 Cal.4th at page 100, the trial court instructed the jury on second degree murder using CALJIC No. 8.31.[3] The instruction provided that second degree murder "'is . . . the unlawful killing of a human being when: [¶] 1. The killing resulted from an intentional act, [¶] 2. *The natural consequences of the act are dangerous to human life*, and [¶] 3. The act was deliberately performed with

_____

[3] CALJIC and CALCRIM are two different sets of jury instructions. CALJIC was published by a committee on the Los Angeles Superior Court for decades until 2005. It is now published by Thompson-West. CALCRIM was first published by the Judicial Council in 2005. (Levenson & Ricciardulli, Cal. Crim. Jury Instr. Companion Handbook (2025) § 1:2.) CALCRIM contains "the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).)

knowledge of the danger to, and with conscious disregard for, human life.'" (Italics added.)

The defendant argued on appeal that CALJIC No. 8.31 "misstate[d] the law" by omitting "a requirement that [the] defendant commit the act with a *high probability* that death will result. [Citation.] [The defendant] argue[d] that such a requirement articulate[d] an elevated standard above that which [was] incorporated in . . . CALJIC No. 8.31, which require[d] an act whose 'natural consequences' [were] dangerous to life. A former version of CALJIC No. 8.31 included the requirement of a 'high probability' of death." (*People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.) The State Public Defender also filed an amicus brief urging the Supreme Court to hold that "the high-probability requirement should be reinstated in the [CALJIC] instructions defining second degree murder." (*Ibid*.)

Our Supreme Court rejected the positions of the defendant and the State Public Defender, holding that the jury instructions accurately stated the law. (*People v. Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.) It explained, "we indicated in [*Watson*] that the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' *are equivalent and are intended to embody the same standard*. [Citations.] Accordingly, we find no error in the trial court's use of CALJIC No. 8.31 and decline amicus

curiae's invitation to recommend modification of the instruction."[4] (*Ibid.*, italics added.)

The Supreme Court reaffirmed the equivalence of these two tests in *Reyes*, which involved an appeal of a denied resentencing petition under former section 1170.95 (now section 1172.6). In *Reyes*, the defendant and some fellow gang members had bicycled into rival gang territory. One of the other members in their group shot at a passing car and killed the driver, and the defendant was convicted of second degree murder. (*Reyes*, *supra*, 14 Cal.5th at pp. 985–986.) The trial court denied the defendant's resentencing petition after an evidentiary hearing, finding sufficient evidence to sustain his murder conviction under an implied malice theory. (*Id*. at pp. 986–987.)

In reversing the trial court, the Supreme Court cited both the *Phillips* and *Thomas* tests. Its discussion of implied malice began with the *Phillips* test: "We first address simple implied malice murder. Murder is committed with implied malice when 'the killing is proximately caused by "'an act, *the natural consequences of which are dangerous to life*, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*Reyes*, *supra*, 14 Cal.5th at p. 988, italics added.)

_____

[4] In *Watson*, our Supreme Court stated that "second degree murder based on implied malice has been committed when a person does ""an act, *the natural consequences of which are dangerous to life*, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life'" . . . .' [Citations.] Phrased in a different way, malice may be implied when defendant does an act *with a high probability* that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Watson*, *supra*, 30 Cal.3d at p. 300, italics added.)

The Court cited the *Thomas* test later in the opinion. It stated, "we also take issue with the trial court's conclusion that '[t]he natural and probable consequences' of [the defendant']s act of traveling to rival gang territory with several other gang members, one of whom was armed, 'were dangerous to human life.' To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[] *a high degree of probability* that it will result in death."'" (*Reyes*, *supra*, 14 Cal.5th at p. 989, italics added.) Significantly, the Court reiterated that the *Thomas* and *Phillips* tests are equivalent: "[U]nder the objective component of implied malice, ""dangerous to life"" *means the same thing* as a "'high degree of probability that'" the act in question "'will result in death.'"" (*Ibid.*, italics added.)

## D. Clarification Instruction

Bunn also argues that the trial court's instruction on implied malice was incomplete, and the court erred by failing to clarify that the jury had to find that her actions carried a high probability of causing death. But Bunn concedes that she failed to request a clarification of the implied malice standard at trial. As such, she has waived any argument of error on appeal. Besides, even if the argument has not been waived, Bunn has not shown any error.

"A 'trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense' [citation], and such claims are preserved even absent an objection." (*People v. Bay* (2019) 40 Cal.App.5th 126, 136–137.) However, it "has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620,

10

638; *People v. Hin* (2025) 17 Cal.5th 401, 483 ["'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language'"].)

Our Supreme Court has consistently stated for decades that the *Thomas* and *Phillips* tests are equivalent. (*Reyes*, *supra*, 14 Cal.5th at pp. 988–989; *People v. Nieto Benitez, supra*, 4 Cal.4th at p. 111; *Watson, supra*, 30 Cal.3d at p. 300.) Thus, the trial court's instruction accurately stated the law. If Bunn believed the implied malice instruction "required elaboration or clarification, [she] was obliged to request such elaboration or clarification in the trial court." (*People v. Lee, supra*, 51 Cal.4th at p. 638.) Her "fail[ure] to object to the trial court's [implied malice] instruction or to request any modification or amplification of it at trial" forfeits the issue on appeal. (*Ibid*.)

In response, Bunn asserts that we may still review an instructional error claim if her substantial rights were affected. "[T]he failure to object to an instruction in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

However, Bunn cannot show any error or miscarriage of justice. Our Supreme Court already rejected her argument in *People v. Nieto Benitez, supra*, 4 Cal.4th at page 111. It found no error in the trial court's use of the *Phillips* test alone because it was "equivalent and . . . intended to embody the same standard" as the *Thomas* test. (*Ibid*.)

Bunn similarly argues that her counsel's failure to request a clarifying instruction at trial constitutes ineffective assistance of counsel.

11

This argument fails for the same reasons. Since the *Phillips* and *Thomas* tests are equivalent, Bunn cannot show her counsel's performance fell below an objective standard of reasonableness or a reasonable probability of a more favorable result had her counsel requested a clarifying instruction. (See *People v. Dickey* (2005) 35 Cal.4th 884, 907 [stating elements for ineffective assistance of counsel].)

## II.

### FINES

The trial court's minute order and abstract of judgment state that the court imposed (1) a restitution fine (§ 1202.4, subd. (b)), which was stayed, and (2) a parole revocation fine (§ 1202.45, subd. (c)), which was suspended. Bunn contends these fines must be stricken to match the court's oral pronouncement of judgment. (See *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 [oral pronouncement of judgment controls].) We find no error.

During sentencing, the trial court asked the prosecution, "[G]iven the length of the sentence, is there any objections [*sic*] to waiving the fines and fees per [*People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*)]?" The prosecutor had none, so the court stated, "All right. Then all of the fines and fees will be waived because the defendant has an inability to pay." The court then "impose[d] the terms set forth on . . . the presentencing report, except for the various fines that have been waived per *Dueñas* and the restitution is to be determined." Bunn believes the court's statement that the above fines were "waived" means they were stricken.

We begin with the meaning of "waive." While "waive" can mean "to refrain from pressing or enforcing," it can also mean "to put off from immediate consideration." (Merriam-Webster's Dict. Online (2026),

<https://www.merriam-webster.com/dictionary/waive> [as of Apr. 6, 2026]
archived at: https://perma.cc/ZA7P-8WG6.)

With these definitions in mind, we observe that the trial court
ruled that the fines were "waived per *Dueñas*." We read this statement to
mean that the lower court intended to follow the same procedures as *Dueñas*.
*Dueñas* held "that although the trial court is required by Penal Code section
1202.4 to impose a restitution fine, the court *must stay the execution of the
fine* until and unless the People demonstrate that the defendant has the
ability to pay the fine." (*Dueñas, supra*, 30 Cal.App.5th at p. 1172,
disapproved on other grounds in *People v. Kopp* (2025) 19 Cal.5th 1, 23,
fn. 17, italics added.)[5] While *Dueñas* did not address parole revocation fines,
they are "essentially a corollary of the restitution fine imposed under section
1202.4, subdivision (b)." (*People v. Son* (2020) 49 Cal.App.5th 565, 577, fn.
14.) Thus, when the court stated it was "waiving" the restitution and parole
revocation fines, we can reasonably infer it meant to stay their execution (i.e.,
postpone them) as *Dueñas* did.

### III.

### CUSTODY CREDITS

Bunn argues she is entitled to three more days of actual custody
credits. The Attorney General's office agrees with Bunn, and so do we.

Bunn's probation report states that she was arrested on
September 14, 2017, and released on bail on November 11, 2017. The trial

---

[5] *Kopp* held that "[c]ontrary to *Dueñas*'s suggestion, we do not
find a due process requirement to hold an ability to pay hearing before
imposing every punitive fine." (*People v. Kopp, supra*, 19 Cal.5th at p. 23.) It
also "clarif[ied] that the excessive fines analysis, which considers ability to
pay, is the proper vehicle to challenge punitive fines." (*Ibid.*)

court calculated a portion of Bunn's actual custody credits using these dates. However, the probation report's release date is incorrect. At trial, the parties stipulated that Bunn was released on bail on November 14, 2017, i.e., three days later than the probation report's date. Given this stipulation, the court calculated Bunn's actual custody credit using the wrong date, and she is entitled to three more days of credit.

The trial court calculated that Bunn had 1,728 days of actual custody credit. We modify the judgment to credit Bunn with 1,731 days of actual custody time. (See *People v. Jones* (2000) 82 Cal.App.4th 485, 493–494 [modifying judgment to correct custody credits].)

DISPOSITION

The judgment is modified to award Bunn 1,731 days of actual custody credits. In all other respects, the judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


GOODING, J.

14